UNITED STATES of America,
Appellee,

v.

Francis BOCCAGNA, Defendant–
Appellant.

Docket No. 04–5099–cr.

United States Court of Appeals,
Second Circuit.

Argued: June 9, 2005.

Decided: June 13, 2006.

Richard H. Rosenberg (Michael O. Hueston, on the brief), New York, NY, for Defendant–Appellant.

Peter A. Norling, Assistant United States Attorney (Nicole Boeckmann, Assistant United States Attorney, on the brief), for Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Brooklyn, NY, for Appellee.

Before JACOBS, SACK, and RAGGI, Circuit Judges.

REENA RAGGI, Circuit Judge.

Defendant Francis Boccagna pleaded guilty in the United States District Court for the Eastern District of New York (Joanna Seybert, *Judge*) to one count of making a false statement to a federally insured lending institution in violation of 18 U.S.C. § 1014. Sentenced to a term of three years' probation, Boccagna appeals only from the part of his judgment of conviction that, pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"), Pub.L. No. 104–132, 110 Stat. 1214, 1227 (codified principally at 18 U.S.C. §§ 3663A and 3664), orders him to pay $18,629,716 in restitution to the United States Department of Housing and Urban Development ("HUD"), the guarantor on various defaulted loans obtained pursuant to the charged criminal scheme. Boccagna challenges his restitution order on three grounds. First, he asserts that the order violates the Sixth Amendment as construed in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), because the award is based on facts that were neither proved beyond a reasonable doubt to a jury nor admitted by him in his plea allocution. Second, Boccagna argues that HUD was, in any event, not entitled to any restitution because its claimed out-of-pocket losses were more than offset by the fair market value of the foreclosed collateral that it acquired upon payment of the defaulted loans. *See* 18 U.S.C. § 3663A(b)(1)(B)(ii). Boccagna asserts that the district court erred as a matter of law in calculating offset value by reference to the nominal sale price at which HUD subsequently transferred title to the collateral to a city development agency. Finally, Boccagna submits that the district court's inclusion in its restitution order of certain expenses incurred by HUD in order to acquire title to the foreclosed collateral impermissibly compensated HUD for consequential damages.

Our recent decision in *United States v. Reifler*, 446 F.3d 65 (2d Cir.2006), conclusively resolves the first of these issues. *Reifler* holds that judicial factfinding rele-

vant to an MVRA restitution order does not implicate Sixth Amendment rights. *See id.* at 120. Accordingly, without further discussion, we hereby reject as without merit Boccagna's constitutional challenge to the restitution order.

Insofar as Boccagna also challenges the district court's valuation of real property to be offset against HUD's out-of-pocket loss, we observe that, for purposes of valuing property—whether lost or recouped—under the MVRA, fair market value will generally provide the best measure to ensure restitution in the "full amount" of the victim's loss. 18 U.S.C. § 3664(f)(1)(A). At the same time, however, we recognize that, in some circumstances, for example, where property is unique or where no active market exists for its purchase, other measures of value may better serve the MVRA's compensatory purpose. For this reason, we decline to hold that, as a matter of law, only fair market value may be used in calculating property values under the MVRA. Nevertheless, we conclude that the nominal sale price of property with a higher fair market value cannot be used to calculate offset value because such a calculation impermissibly awards a victim restitution in excess of its compensable loss. See *United States v. Nucci*, 364 F.3d 419, 423 (2d Cir.2004). Accordingly, we hereby vacate so much of the judgment of conviction as orders Boccagna to pay HUD $18,629,716 in restitution, and we remand for recalculation of restitution in a manner consistent with this opinion.

## I. *Factual Background*

### A. *HUD–Insured 203(k) Mortgage Loans*

From November 1997 through December 1999, Francis Boccagna and various confederates participated in an elaborate scheme fraudulently to obtain millions of dollars through private real estate mortgage loans insured by HUD under its 203(k) loan program. See 24 C.F.R. §§ 203.50, 203.440 *et seq.* The 203(k) program is HUD's primary vehicle for stimulating the private rehabilitation and development of residential properties, consistent with HUD's stated mission to "increase home ownership, support community development and increase access to affordable housing free from discrimination." Appellee Br. 6–7.

To procure a 203(k) loan, a prospective buyer must submit both a mortgage application to an approved private lender and a 203(k) application to HUD. The private lender grants the mortgage contingent on HUD approving the 203(k) application and agreeing to guarantee the loan. Once HUD's approval is secured, the private lender disburses money to the buyer in two steps. At step one, the buyer directly receives the amount of money necessary to purchase the residence at issue. At step two, another sum of money is placed into an escrow account, from which the buyer is authorized to make withdrawals to pay for the accrued costs of rehabilitation work. The regulations effectively limit the number of properties an individual such as Boccagna can acquire and rehabilitate through the 203(k) loan program. No such limitation, however, applies to not-for-profit organizations, which can be awarded multiple 203(k) loans to acquire and rehabilitate numerous low-to-moderate income properties.

### B. *The Fraud Scheme*

In the late 1990s, Boccagna surveyed the New York City residential real estate market in search of undervalued distressed properties. Purchasing a host of these properties in his own name, Boccagna proceeded to "sell" them to not-for-

profit organizations at inflated prices.[1] In the two-year period from January 1998 to December 1999, Boccagna "flipped" 162 residential properties, most located in Harlem, to not-for-profit organizations.

In fact, the transactions were shams. The not-for-profit organizations were mere nominal purchasers complicit with Boccagna and his confederates in a scheme to obtain millions of dollars in 203(k) loans under false pretenses. For each property "purchased" by a not-for-profit, Boccagna generally paid representatives of that organization $5,000 to $10,000 in kickbacks. Thereafter, Boccagna assumed sole responsibility for the maintenance and contracting costs on the acquired properties, as well as for repayment of the 203(k) mortgage loans. Boccagna's original plan was to use this loan money to rehabilitate the properties quickly and to sell them in the open market for a profit to be split between Boccagna and the nominal not-for-profit owners. The scheme soon ran into an insurmountable hurdle: New York City's zoning bureaucracy. Unable to secure the certificates required to effect a quick rehabilitation and resale of the properties, Boccagna instead found himself carrying high mortgage and maintenance costs on unprofitable realty. By early 2000, with his assets almost depleted, Boccagna decided to contact government authorities and to confess his misdeeds.

### C. *HUD's Acquisition and Disposition of Certain Mortgaged Properties*

At some unspecified point after Boccagna approached the government, eighty-eight of the 162 fraudulently acquired properties were in foreclosure proceedings. As guarantor of the 203(k) mortgage loans, HUD eventually acquired title to fifty-three of these properties ("the foreclosure properties") by paying down the accelerated loan balances, as well as outstanding taxes, maintenance fees, and associated expenses. This resulting out-of-pocket loss to HUD totaled $20,609,746.

To dispose of the foreclosure properties in a manner consistent with its mission, HUD, in January 2002, entered into a Memorandum of Understanding with the New York City Department of Housing Preservation and Development ("HPD") whereby HPD agreed to purchase the foreclosure properties for what the government concedes were essentially nominal prices ranging from $1 to $120,000, for a total of $1,980,030. It was further agreed that HUD and HPD would jointly undertake to repair a total of 2,200 dwelling units in the foreclosure properties. HUD would pay relocation expenses for families that had to move during the renovation. Meanwhile, HPD agreed to afford all existing tenants in the foreclosure properties the opportunity to purchase renovated dwelling units at affordable prices and/or to provide federally funded rental assistance to qualifying tenants.

### D. *Boccagna's Plea and Sentencing*

Meanwhile, on March 14, 2001, Boccagna pleaded guilty to one count of making false statements for the purpose of influencing the lending decisions of federally insured financial institutions, for which crime he faced a statutory maximum prison sentence of thirty years. *See* 18 U.S.C. § 1014. Pursuant to the MVRA, the district court was required, in sentencing Boccagna, to order him to pay restitution to any victim of his scheme that had sustained a pecuniary loss. *See id.* § 3663A.

---

1. Because the various steps necessary to effect these transfers are not relevant to this appeal, we do not detail them here.

In its Presentence Report ("PSR") to the district court, the Probation Department recommended that Boccagna be held accountable, both for purposes of Guidelines calculation, see U.S.S.G. § 2F1.1(b)(1) (1998), and restitution, for a $15,683,074 loss to HUD. Although the Probation Department did not provide the court with numerical calculations supporting its recommendation, it stated that the reported loss "represent[s] the difference between the amounts paid out by HUD and the sales prices of the properties to the third parties." PSR ¶ 16. Both the defendant and the government filed written submissions with the district court challenging this calculation.

In an August 13, 2004 letter, Boccagna's counsel submitted that HUD had sustained no loss either for purposes of Guidelines calculation or restitution. He noted that the defense had not been provided with any documentation to support the loss amount recommended in the PSR. In any event, he submitted that, if the court were to consider the "fair market value" of the foreclosure properties "at the time of sentence," that offset value "would exceed the outlays made by HUD." Rosenberg Letter at 6.

In its August 17, 2004 submission to the court, the government contended that the PSR overstated the loss amount relevant to the calculation of Boccagna's Sentencing Guidelines range and understated the loss relevant to restitution. It argued that, for Guidelines purposes, HUD's loss should be calculated not by reference to its outlays with respect to all of the foreclosure properties, but only with respect to the eleven properties whose sale to HPD was final at the time of sentencing. See U.S.S.G. § 2B1.1, Application Note 3(E)(ii) (2003). Thus, it proposed a Guidelines loss figure of $3,384,425, representing HUD's total payments of $3,984,426 in connection with these properties minus the total $600,001 purchase price paid by HPD. With respect to restitution, however, the government argued that the court was required to order Boccagna to pay HUD $18,629,716, representing HUD's $20,609,746 out-of-pocket loss reduced by the $1,980,030 it expected to realize when the sales of all foreclosure properties to HPD were finalized.

In an addendum to the original PSR, the Probation Department adopted the government's actual loss figure of $3,384,425 to recalculate Boccagna's Guidelines, resulting in a recommended 27–to–33 month prison range. Probation further urged that restitution to HUD be limited to this same amount, explaining that "recent appraisals" of the forty-two foreclosure properties whose sale to HPD had not yet been finalized had "been determined by the Government to be equivalent to HUD's loss." PSR Addendum at 1. Thus, because "the possibility exists that the [remaining forty-two foreclosure] properties could be sold at higher prices [than those agreed to by HPD] and thus could effectively cancel out any remaining restitution," Probation recommended an award of $3,384,425, representing the "final actual loss amount" at the time of sentence. Id. In an apparent reference to 18 U.S.C. § 3664(d)(5) (affording victim sixty days after discovery of further losses to petition court for amended restitution order), Probation noted that "[s]hould this figure rise in the future," the restitution order "may need to be modified." Id.

When Boccagna appeared for sentencing on August 20, 2004, the parties' primary focus was understandably on circumstances that might support a non-incarceratory sentence. After the district court stated its intent to impose a probationary sentence, however, they shifted their attention to the calculation of restitution. The government renewed its written re-

quest for an $18,629,716 restitution order, explaining that HUD expected to recover only $1,980,030 of its out-of-pocket loss through the sale of foreclosure properties to HPD. Similarly, defense counsel reiterated his complaint about the lack of documentation to support the government's restitution calculation and repeated his request to use the fair market value of the foreclosure properties to offset HUD's out-of-pocket loss. Noting simply that Boccagna's early plea likely afforded him an advantage in the calculation of HUD's loss, *see* Sentencing Tr. at 36 ("You come in early on, you get a much better number because there aren't that many properties in default."), the district court ordered restitution in the full amount requested by the government, $18,629,716, that amount to be paid by Boccagna jointly and severally with ten other persons prosecuted separately for their participation in the same fraud scheme.

## II. *Discussion*

### A. *Boccagna's Challenge and the Standard of Review*

The MVRA mandates that "[n]otwithstanding any other provision of law," a sentencing court "shall order" defendants convicted of certain crimes to "make restitution" to their victims. 18 U.S.C. § 3663A(a)(1); *see United States v. Reifler*, 446 F.3d at 113. In the case of a crime "resulting in damage to or loss or destruction of property of a victim," the statute further provides that the order of restitution "shall require" the defendant to

(A) return the property to the owner of the property or someone designated by the owner; or

(B) if return of the property under subparagraph (A) is impossible, impracticable, or inadequate, pay an amount equal to—

 (i) the greater of—

 (I) the value of the property on the date of the damage, loss, or destruction; or

 (II) the value of the property on the date of sentencing, less

 (ii) the value (as of the date the property is returned) of any part of the property that is returned.

*Id.* § 3663A(b)(1). On this appeal, we focus primarily on subpart (B) of this MVRA provision.

In challenging the restitution order in his case, Boccagna does not dispute that his fraud crime of conviction falls within the MVRA mandate. See *id.* § 3663A(c)(1)(A)(ii) (stating that MVRA applies in all sentencing proceedings involving "an offense against property under this title, including any offense committed by fraud or deceit"). Nor does he challenge HUD's status as a victim of his offense that incurred out-of-pocket loss. *See id.* § 3663A(a)(2) (defining "victim"). Instead, he claims that HUD is not entitled to any restitution award because its loss was fully compensated by the fair market value of the foreclosure properties to which it acquired title. *See id.* § 3663A(b)(1)(B)(ii). In opposing this argument, the government does not dispute that, pursuant to § 3663A(b)(1)(B)(ii), HUD's out-of-pocket loss was appropriately offset by recouped collateral.[2] It submits simply that the district court acted within its discretion in valuing this collateral at HUD's nominal resale price to

---

2. The government does not, for example, argue that the MVRA offset provision, by providing for loss to be reduced by "the value . . . of any part of *the property* that is returned," 18 U.S.C. § 3663A(b)(1)(B)(ii) (emphasis added), applies only to the actual cash expended by HUD in making the fraudulently obtained loans and not to any property that HUD obtained after default. Such an argument would not be convincing. As two of our sister circuits, construing identical offset language in the Victim and Witness Protection Act,

HPD without regard to its fair market value.

■ In general, we review an MVRA order of restitution deferentially, and we will reverse only "for abuse of discretion." *United States v. Reifler*, 446 F.3d at 120; *United States v. Harris*, 302 F.3d 72, 75 (2d Cir.2002) (*per curiam*). To identify such abuse, we must conclude that a challenged ruling "rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions." *United States v. Gonzalez*, 420 F.3d 111, 120 (2d Cir.2005) (internal quotation marks omitted). To the extent Boccagna contends that the district court erred as a matter of law in using a nominal resale price rather than fair market value to calculate offset value in this case or in including collateral damages within HUD's loss, he raises questions of law that we review *de novo*. *See United States v. Reifler*, 446 F.3d at 120; *United States v. Ekanem*, 383 F.3d 40, 42 (2d Cir.2004); *see also United States v. Simmonds*, 235 F.3d 826, 829 (3d Cir.2000) (reviewing *de novo* district court's use of "replacement value" to measure loss under MVRA); *United States v. Shugart*, 176 F.3d 1373, 1375 (11th Cir.1999) (same).

B. *Boccagna Fails to Identify the "Fair Market Value" of the Foreclosure Properties on the Date of HUD's Acquisition*

Before discussing Boccagna's argument that the district court was obliged to calculate the offset value of the foreclosure properties by reference to their fair market value, we note that he fails to identify that value in the record. Although the August 20, 2004 addendum to Boccagna's PSR states that "recent appraisals" conclude that the value of the foreclosure properties equals HUD's loss, PSR Addendum at 1, these appraisals are not available for our review because they are not part of the record on appeal. In any event, because they appear not to have been conducted until sometime in 2004, their relevancy to a determination of offset value is questionable.

The MVRA plainly states that offset value must be determined as of the date property is recouped by the victim. *See* 18 U.S.C. § 3663A(b)(1)(B)(ii) (requiring offset value to be determined "as of the date the property is returned"). Because HUD's acquisition of the foreclosure properties preceded the referenced appraisals by several years, it is by no means obvious that the 2004 appraisals provide a reliable measure of the properties' fair market value "as of the date" specified in the MVRA. Thus, to the extent the district court, on remand, will need to consider the fair market value of the foreclosure properties in calculating an offset against loss, the parties should be prepared to produce evidence of fair market value on the date when title passed to HUD.

codified at 18 U.S.C. § 3663, have concluded, when a lender victim acquires title to property securing a loan, "the value of such property should constitute a partial return of the cash loan proceeds." *United States v. Holley*, 23 F.3d 902, 915 (5th Cir.1994) (internal quotation marks omitted); *see United States v. Smith*, 944 F.2d 618, 625 (9th Cir.1991) (holding that defendant "should receive credit against the restitution amount for the value of the collateral property as of the date title to the property was transferred" to lender victim). In an MVRA case, the Seventh Circuit similarly concluded that the statute's offset provision did not require strict identicality between the property lost and the property "returned." *United States v. Shepard*, 269 F.3d 884, 888 (7th Cir.2001) ("So long as [the victim] regain[s] beneficial use of the [cash], it has been 'returned' as § 3663A(b)(1)(B)(ii) uses that term.").

C. *Although the MVRA Does Not Mandate the Use of Fair Market Value to Value Property, Nominal Resale Price Cannot Be Used as the Measure of Property Value*

1. *The Plain Language of the MVRA Does Not Mandate a Single Measure of Property Value*

In considering whether the MVRA requires property to be valued by reference to fair market value, we begin with the text of the statute. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 289–90 (2d Cir.2002). "If the statutory language is unambiguous" on this point, "and the statutory scheme is coherent and consistent," no further inquiry is required. *Robinson v. Shell Oil Co.,* 519 U.S. at 340, 117 S.Ct. 843 (internal quotation marks omitted). In determining whether statutory language is unambiguous, we "reference . . . the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 341, 117 S.Ct. 843; *accord Daniel v. Am. Bd. of Emergency Medicine,* 428 F.3d 408, 423 (2d Cir.2005). Only if we conclude that statutory language is ambiguous "do we resort . . . to canons of construction and, if the meaning [still] remains ambiguous, to legislative history." *Daniel v. Am. Bd. of Emergency Medicine,* 428 F.3d at 423.

■ The MVRA employs the term "value" in two separate, but interrelated, clauses necessary to the calculation of a restitution award. Title 18 U.S.C. § 3663A(b)(1)(B)(i) references "the value of the [victim's] property" that was damaged, lost, or destroyed as a result of the crime of conviction. 18 U.S.C. § 3663A(b)(1)(B)(i) (emphasis added). Subsection (ii) references "the value . . . of any part of the property that is returned," in other words, the offset value. *Id.* § 3663A(b)(1)(B)(ii) (emphasis added). Thus, the MVRA unambiguously tells a court *what* to value (the property lost; the property returned) and even *when* to value it (in the case of the loss value, property is evaluated "on the date of the damage, loss, or destruction," id. § 3663A(b)(1)(B)(i)(I)', or "on the date of sentencing," *id.* § 3663A(b)(1)(B)(i)(II), whichever is greater; in the case of offset value, property is evaluated "as of the date the property is returned," *id.* § 3663A(b)(1)(B)(ii)). The statute is silent, however, on the question of *how* the referenced property is to be valued. *See United States v. Simmonds,* 235 F.3d at 831 (observing that MVRA is "silent as to which . . . measure[ ] should be used to determine the value" of the property); *cf. Associates Commercial Corp. v. Rash,* 520 U.S. 953, 961, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997) (observing that § 506(a) of the Bankruptcy Code "does speak to the *how* question" of valuation for specified property (emphasis in original)). Notably, nowhere does the statute reference "fair market value" as the only measure to be used in making the restitution calculations contemplated by § 3663A(b)(1)(B). *Cf. BFP v. Resolution Trust Corp.,* 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (declining, in bankruptcy context, to use "fair market value" as measure of property value, noting that the "well-established" term did not appear in the relevant statute although it was referenced in other provisions of law). Rather, the law appears to contemplate the exercise of discretion by sentencing courts in determining the measure of value appropriate to restitution calculation in a given case. Title 18 U.S.C. § 3664(f)(1)(A) states that a "court shall order restitution to each victim in the full amount of each victim's losses *as determined by the court* and without consider-

ation of the economic circumstances of the defendant." (emphasis added). Accordingly, because the law recognizes a number of reasonable measures of property value, *see BFP v. Resolution Trust Corp.*, 511 U.S. at 543 n. 7, 114 S.Ct. 1757 (discussing use of foreclosure price as measure of value in bankruptcy proceeding); *United States v. Simmonds*, 235 F.3d at 832 (using replacement value rather than fair market value in calculating restitution), we construe "value" as used in the MVRA to be a flexible concept to be calculated by a district court by the measure that best serves Congress's statutory purpose, *see generally Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 496, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (holding that statutory language should be construed "in light of the purposes Congress sought to serve"); *United States v. Duverge Perez*, 295 F.3d 249, 254 (2d Cir.2002) ("A district judge has broad discretion as to what types of procedure are needed at a sentencing proceeding for determination of relevant disputed facts.") (internal quotation marks omitted).

2. *Value Determinations Must Serve the Compensatory Purpose of the MVRA*

a. *Fair Market Value Determinations Will Generally Best Serve the MVRA's Compensatory Purpose*

In determining the appropriate measure of value for property relevant to restitution, a district court must consider that the purpose of restitution is essentially compensatory: to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury. *See Hughey v. United States*, 495 U.S. 411, 416, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990) (observing that the "meaning of 'restitution' is restoring someone to a position he occupied before a particular event"); *United States v. Coriaty*, 300 F.3d 244, 253 (2d

Cir.2002) (holding that "statutory focus" of the MVRA is "upon making victims whole"). Because the MVRA mandates that restitution be ordered to crime victims for the "full amount" of losses caused by a defendant's criminal conduct, *see* 18 U.S.C. § 3664(f)(1)(A); *United States v. Reifler*, 446 F.3d at 134 (remanding where calculation errors violated "the MVRA requirement that the order [of] restitution award restitution in the full amount of the victims' losses"), it can fairly be said that the "primary and overarching" purpose of the MVRA "is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." *United States v. Simmonds*, 235 F.3d at 831.

In most circumstances, fair market value will be the measure most apt to serve this statutory purpose. "Fair market value" is defined as the "price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction." *Black's Law Dictionary* 1587 (8th ed.2004); *see also Gillespie v. United States*, 23 F.3d 36, 40 (2d Cir. 1994) (defining "fair market value" as " 'the price at which the property would change hands between a willing buyer and a willing seller' ") (quoting *United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973)); Restatement of Restitution § 151 cmt. b (1937) (defining "value" of property acquired by consciously tortious conduct as "the amount for which it could be exchanged if there were an open market with a wide opportunity for buyers"). Because this price reflects the value of property's greatest economic use, it generally provides the most reliable measure of both the full loss sustained by a victim when his property is damaged, lost, or destroyed, and the degree to which

that loss is mitigated by recouped property.

### b. Other Measures of Value Can Sometimes Better Serve the Statute's Compensatory Purpose

Notwithstanding the general reliability of fair market value as a measure of property value, in some circumstances other measures of value may more accurately serve the statutory purpose to ensure a crime victim's recovery of the full amount of his loss.

For example, when the "actual cash value" of the damaged, lost, or destroyed property "is difficult to ascertain—because an item is unique, or because there is not a broad and active market for it," "replacement cost" rather than fair market value may better compensate a victim for the full amount of his loss. *United States v. Shugart*, 176 F.3d at 1375. In Shugart, the property at issue was a century-old Georgia church destroyed by arson. As the Eleventh Circuit noted, a church is hardly "a fungible commodity" for which congregations may trade in an active market. *Id.* Rather, a church is a "unique" property, "valued by its members precisely because of its location, its design, and the memories it evokes." *Id.* Because the market would not necessarily factor all these considerations into its determination of value, *Shugart* concluded that "the only effective way to return to the victims the fair equivalent of what they lost" was to award restitution by reference to replacement value so that the congregation could "rebuild a church comparable in size and design on the same lot where the original church stood." *Id.*

Following *Shugart*, the Third Circuit has also used replacement rather than fair market value in awarding restitution to an arson victim for the loss of residential furniture. *See United States v. Simmonds*, 235 F.3d at 831. Although the furniture was not "unique," the court concluded that it had "a personal value to its owners" that could not be "captured or accurately estimated by simply determining [its] market value." *Id.* at 832.

Obviously, a concern for the unique or personal value of property is more apt to arise with respect to property lost, rather than substitute property recouped, by the victim. Because substitute property is recouped by a crime victim in lieu of the cash compensation to which he would otherwise be entitled as restitution for his loss, *see generally United States v. Oren*, 893 F.2d 1057, 1066 (9th Cir.1990) (observing that if victim declines to accept land offered in compensation for loss, defendant must pay restitution without benefit of an offset), the offset value of such property is generally best determined by reference to the cash it would bring the victim in a sale on the open market. We recognize that, in some circumstances, the "market" for recouped property may be poorly developed or nonexistent. For example, where collateral is subject to foreclosure proceedings, a sentencing court may consider whether a "forced-sale" price most accurately represents its fair market value on the date of acquisition. *Cf. BFP v. Resolution Trust Corp.*, 511 U.S. at 539, 114 S.Ct. 1757 (noting that "property that must be sold within [foreclosure] strictures is simply *worth less*" (emphasis in original)).[3]

In any event, because the MVRA does not, *in haec verba*, require a district court

---

**3.** The appellate record does not permit us to determine if HUD's acquisition of the foreclosure properties was actually pursuant to a sale. On remand, the district court may, at its discretion, explore this point to consider whether the sale price (if any) was a reasonable measure of value.

to value property only by reference to fair market value, and because other measures of value may, in appropriate circumstances, provide a more accurate measure of the "full amount" of a victim's loss, we decline to hold that, as a matter of law, district courts may only use fair market value in making the property calculations contemplated by 18 U.S.C. § 3663A(b)(1)(B).

3. *A Nominal Sale Price Cannot Be Used to Measure Offset Value Because It Affords the Victim a Windfall*

 Although we recognize a sentencing court's discretion, when fashioning a restitution award, to value property by reference to measures other than fair market value, that discretion is necessarily circumscribed by an important caveat: the MVRA does not permit awards "in excess of the amount of the [victim's] loss." *United States v. Nucci,* 364 F.3d at 423; *see also id.* (observing that "reading the [MVRA] to provide recovery in excess of the amount of the loss would be in derogation of the common law," which Congress has not "clearly and unequivocally . . . authorize[d]"). In short, a sentencing court cannot order restitution that "goes beyond making [the victim] whole." *United States v. Gordon,* 393 F.3d 1044, 1060 (9th Cir. 2004); *United States v. Dawson,* 250 F.3d 1048, 1050 (7th Cir.2001) (holding that victim "should not receive anything more in restitution than is required to make [it] whole"). It cannot award the victim "a windfall," i.e., more in restitution than he actually lost. *United States v. Arutunoff,* 1 F.3d 1112, 1121 (10th Cir.1993); *see*

*United States v. Stanley,* 309 F.3d 611, 613 (9th Cir.2002) (holding MVRA does not allow "double recovery by a victim").

Mindful of this principle, we conclude that when recouped property is resold at a nominal price, a court abuses its discretion in using that price to calculate offset value because such a calculation necessarily exceeds the amount necessary to make the victim whole.[4] It effectively awards the victim *both* restitution in the full amount of loss offset only by the nominal sale price *and* the benefit of the recouped property to the extent that the victim is able to make a gift to a putative purchaser in an amount equal to the difference between the property's fair market value and the nominal sale price. Such a valuation method does not put the victim in the same position he would have been in but for the defendant's criminal conduct; it puts him in a better position.

A concrete example illustrates the point. If a theft victim suffered the loss of a jewel with a fair market value of $100,000, and if he thereafter recouped from the defendant a substitute jewel with a market value of $50,000, and if the victim sold the substitute jewel to his son for $1, the use of that nominal sale price as offset value would allow the victim to receive the benefit of both a $49,999 gift to his son, and $99,999 in restitution from the defendant, for a total recovery of $149,998 on his $100,000 loss. Plainly, such a restitution calculation would put the victim in a significantly better position than he was in before the theft.[5]

The government submits that HUD's transfers of foreclosure properties to HPD are distinguishable because the challenged

---

4. A "nominal" price is one that is "trifling, esp[ecially] as compared to what would be expected." *Black's Law Dictionary* 1075 (8th ed.2004).

5. Put another way, such an award requires the defendant both to pay the victim the full amount of his loss (minus only $1.00) and to subsidize the victim's substantial gift to his son.

nominal sale prices were agreed to pursuant to the agency's mission to promote affordable low income housing. As HUD explains in its brief:

> HUD's sales [to HPD] were made pursuant to a program designed to further the agency's mission.... In accordance with this purpose it ... conveyed the properties to HPD at [nominal] amounts that furthered the program goals of protecting tenants, ensuring quality restoration of the buildings, and creating affordable housing opportunities.
>
> ...
>
> If ... HUD had been required simply to sell to the highest bidder, there would have been no guarantee that these properties would actually be developed or that they would be used as affordable housing.... [U]nder the circumstances, the only reasonable option available to HUD was to convey the properties to HPD.

Appellee Br. 11–12.

However laudable HUD's motives in entering into its agreement with HPD, that fact does not help us resolve this appeal. The issue before us is not, after all, whether the district court could insist that HUD sell the foreclosure properties to the highest bidder. It could not. The issue is whether HUD's voluntary decision to sell the foreclosure properties at a nominal rather than fair market price entitles it to recoup the difference between these two amounts as part of a restitution award against Boccagna.

Preliminary to answering this precise question, we reiterate our earlier observation that the MVRA requires recouped property to be valued as of the date it is received by the victim. *See* 18 U.S.C. § 3663A(b)(1)(B)(ii). Because HUD did not reach a sale agreement with HPD until January 2002, some time after HUD itself acquired title to the foreclosure properties, its resale price to HPD—whether nominal or not—would not appear to be a timely measure of value.[6]

More to the point, although HUD is a government entity, nothing in the plain language of the MVRA draws a distinction between government and private victims for purposes of calculating restitution. Because no victim can recover restitution in an amount that exceeds its loss, we necessarily conclude that calculating offset value by reference to a nominal sale price is no more permissible when the victim is a government agency than when the victim is an individual or private entity because such a calculation inevitably results in a windfall to the victim.

By taking title to the foreclosure properties, HUD acquired the ability to defray its $20,609,746 out-of-pocket loss by whatever dollar amount the highest bidder would have paid for those properties in an arm's-length market transaction conducted contemporaneous to the transfer. That dollar amount represents the reasonable offset value of the properties. The difference (if any) between $20,609,746 and that sale dollar amount represents the restitution award necessary to compensate HUD in the full amount of its loss.

When, instead of selling the foreclosure properties on the open market, HUD opted to transfer the properties to HPD, the properties' value was not thereby reduced

---

**6.** This is not to suggest that a district court could not reasonably rely on the sale price paid in a reasonably contemporaneous arm's-length transaction as evidence of property's fair market value. *See generally Ford Motor Credit Co. v. Dobbins,* 35 F.3d 860, 870 (4th Cir.1994) ("Using the sale price ... makes practical sense because it is conclusive evidence of the property's value" so long as that price "is fair and was arrived at on an arm's-length basis.") (internal quotation marks omitted).

to the nominal price. Indeed, if the properties had been destroyed by arson on the eve of transfer to HPD, we expect HUD would vigorously challenge the arsonist's argument that the nominal price represents the value of the property for purposes of calculating his restitution obligations to HUD. In any event, the nominal price was not the only value HUD received for the properties. It also obtained HPD's guarantee that the properties would be developed as low-to-middle income residences. Like the recouped jewel in our earlier hypothetical, this guarantee had a value to HUD equal, at least, to the market price that it decided to forego. A sentencing court cannot allow HUD to receive both the benefit of this development guarantee and a restitution award offset only by a nominal sale price. To do so would place it in a better position than it was in before it agreed to guarantee the 203(k) loans. It would obligate Boccagna both to compensate HUD for the full amount of its out-of-pocket loss (less only HPD's nominal payments) and to subsidize the sale to HPD at least in the amount for which the fair market value of the property exceeded what HPD paid.[7]

In urging a contrary conclusion, HUD submits that its fraudulently induced 203(k) loan guarantees were premised on the borrowers' promise to develop the properties as low-to-middle income residences. In short, it argues that it obtained nothing more from HPD than it had expected from the deceitful borrowers. HUD may well be entitled to sue the borrowers and their confederates for the benefit of its guarantee bargain, but the MVRA is not the vehicle to obtain what would, in effect, be expectation damages.

Expectation damages strive to place an "aggrieved party in the same economic position it would have been in had both parties fully performed" their contractual obligations. *Bausch & Lomb v. Bressler,* 977 F.2d 720, 729 (2d Cir.1992). Criminal restitution, on the other hand, is not concerned with a victim's disappointed expectations but only with his actual loss. As we have already observed, restitution attempts to compensate for loss by "restoring [the victim] to a position he occupied before [the injurious] event." *Hughey v. United States,* 495 U.S. at 416, 110 S.Ct. 1979; cf. Restatement (Second) of Contracts § 384, cmt. a (1981) (noting that restitution strives "to return the parties, as nearly as is practicable, to the situation in which they found themselves before they made the contract").

Before Boccagna and his confederates fraudulently induced HUD to guarantee

---

**7.** We recognize, of course, that Boccagna and his confederates would not likely satisfy even a small fraction of the $18,629,716 restitution order. To that extent, the idea of HUD being placed in a better position than it was in before the crime of conviction may appear more theoretical than real. Nevertheless, in making the calculations required by 18 U.S.C. § 3663A(b)(1)(B), a court assumes that a restitution order will be satisfied and, with that assumption in mind, strives to award restitution in the full amount of a victim's loss without providing "recovery in excess" of that amount. *United States v. Nucci,* 364 F.3d at 423.

We further note that the foreclosures at issue in this case represent only the first wave in a series of defaulted 203(k) loan obligations totaling approximately $70 million. Thus, HUD may well experience (or have experienced) further out-of-pocket losses as a result of the charged fraud. We do not foreclose the district court from considering this possibility on remand. *See United States v. Zakhary,* 357 F.3d 186, 193 n. 6 (2d Cir.2004) (discussing, without deciding, propriety of an increased restitution award on remand to satisfy statutory mandate for compensation in full amount of victim's loss); *see also* 18 U.S.C. § 3664(d)(5) (affording prescribed time within which to petition for amendment of the restitution order to compensate for subsequently discovered further loss).

203(k) loans on the foreclosure properties, HUD was richer by $20,609,746. To the extent Boccagna could have compensated HUD with cash in this amount, HUD would have had no further restitution claim based on its failed expectations about the properties' development. When, instead of recouping cash, HUD took title to the foreclosure properties, the proper offset value of these properties was the dollar amount they could have commanded in a timely exchange on the open market. HUD's voluntary decision to sell these properties for a lesser nominal price to a buyer willing to provide it with a desired development guarantee did not lessen this offset value.[8]

Accordingly, because we conclude that a nominal sale price cannot reliably measure offset value when property has a higher fair market value, we remand this case to the district court for it to determine the fair market value of the foreclosure properties at the time HUD acquired title and to offset that amount against the $20,609,746 out-of-pocket loss sustained in this case.[9]

---

**8.** To the extent Boccagna argues HUD's $20,609,746 loss was not "caused" by his actions because the agency's sale of the foreclosure properties to HPD for a nominal price was an "intervening act" that broke the causal nexus between the offense conduct and the loss, *see* Appellant Br. 9–10, this argument is unconvincing. The record plainly shows that HUD lost $20,609,746 out of pocket. Its HPD sale is relevant, if at all, to a possible offset against that loss, not to the defendant's causation of the initial loss. *See generally United States v. Silkowski*, 32 F.3d 682, 689 (2d Cir.1994) (considering first whether losses were "caused" by the offense of conviction and then whether the "amount" of those losses was properly calculated for restitution purposes).

Insofar as Boccagna challenges the use of unconsummated sale prices to determine offset value, we need not address that point

---

**D.** *The Order of Restitution Did Not Compensate for Consequential Loss*

■ Boccagna argues that the district court erred when it accepted as part of HUD's loss calculation such consequential losses as "interest on the loans, maintenance fees, taxes, and selling expenses." Appellant Br. 16. We disagree.

Preliminarily, we observe that, because this challenge was not presented to the district court, we review only for plain error, and we find none in this case. *See United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (noting that a plain error is one that prejudicially affects a defendant's "substantial rights" and "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings"); *accord United States v. Snype*, 441 F.3d 119, 138 (2d Cir.2006).

"Consequential losses" are losses "beyond those which naturally and directly flow" from the defendant's wrongdoing. *Globecon Group, LLC v. Hartford Ins. Co.*, 434 F.3d 165, 176 (2d Cir.2006). We are satisfied from the record that HUD's $20,609,746 out-of-pocket loss all flowed

---

in light of our conclusions that (1) Section 3663A(b)(1)(B)(ii) requires offset value to be determined at the time property is recouped by the victim, and (2) nominal resale value generally cannot be used to measure offset.

**9.** Because the parties have not had the opportunity to brief the question of which of them bears the burden of persuasion on the issue of offset value, we do not here resolve that issue. *See generally United States v. Ruff*, 420 F.3d 772, 775 (8th Cir.2005) ("The MVRA does not stipulate which party bears the burden of proving entitlement to an offset."). We do, however, note that 18 U.S.C. § 3664(e), while imposing on the government "[t]he burden of demonstrating the amount of the loss sustained by a victim," also states that "[t]he burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e).

"naturally and directly" from the collapse of Boccagna's fraud scheme. As guarantor of the loans fraudulently obtained through this scheme, HUD was required to pay out of pocket the borrowers' defaulted obligations, including interest. To the extent HUD minimized its out-of-pocket loss by obtaining clear title to the foreclosure properties that secured the loans, it was only able to do so by paying various taxes and foreclosure expenses. Boccagna can hardly claim an offset credit based on the fair market value of these recouped properties without also factoring HUD's costs in that calculation.[10]

Accordingly, we reject Boccagna's consequential loss challenge as without merit.

## III. *Conclusion*

To summarize:

(1) Boccagna's Sixth Amendment rights were not violated by judicial factfinding relevant to restitution.

(2) While fair market value will generally be the most reliable measure of property value in the calculation of a restitution award, a district court has the discretion to employ alternative measures of value in circumstances where they better serve the compensatory purpose of the MVRA. That discretion does not, however, extend to the use of a nominal sale price as a measure of value because such a calculation of restitution awards the victim a windfall. To the extent nominal sale price was used in this case to measure offset value, we vacate the restitution award and remand the case for recalculation consistent with this opinion.

(3) The expenses incurred by HUD in order to acquire title to the foreclosure properties are not consequential losses and may be included in the calculation of out-of-pocket loss.

We hereby VACATE so much of the district court's judgment of conviction as orders restitution, and we REMAND the case for recalculation of restitution in a manner consistent with this opinion.

---

**10.** Because Boccagna does not suggest that these acquisition costs exceed the fair market value of the property, we have no occasion to consider such a circumstance.