**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-4580

UNITED STATES OF AMERICA,

　　　　　　　Plaintiff - Appellee,

　　　v.

DOMINIC DEMARCUS STEELE,

　　　　　　　Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Frank D. Whitney, Chief District Judge.  (3:16-cr-00211-FDW-DCK-1)

Argued:  March 20, 2018　　　　　　　　　　　　　Decided:  July 27, 2018

Before GREGORY, Chief Judge, WILKINSON, and AGEE, Circuit Judges.

Vacated and remanded by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Wilkinson and Judge Agee joined.

**ARGUED:** Joshua B. Carpenter, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Asheville, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:** Anthony Martinez, Federal Public Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  R. Andrew Murray, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

GREGORY, Chief Judge:

Dominic Steele was convicted of postal theft in violation of 18 U.S.C. § 1709. Relying on the victim's unsupported estimate of its replacement costs, the district court ordered Steele to pay $52,990 in restitution. Because fair market value is the appropriate measure of value for restitution and the Government failed to sufficiently demonstrate the victim's loss, we vacate the restitution order and remand.

I.

In January 2015, the U.S. Postal Service hired Steele as a mail handler assistant at its Processing and Distribution Center in Charlotte, North Carolina. As a part of his duties, Steele processed bulk mail en route to its ultimate destination. Around June 2015, Steele began stealing video game discs sent by GameFly, a video game rental service that ships its merchandise to customers through the mail.[1]

In September 2015, a GameFly Loss Prevention Manager contacted the U.S. Postal Service Office of Inspector General to report a significant loss of GameFly video games intended for the Charlotte Processing and Distribution Center. On December 20, 2015, federal agents interviewed Steele after they observed him leaving the Processing and Distribution Center and placing numerous GameFly discs in his personal vehicle. During the interview Steele admitted to the thefts, and the next day he submitted his resignation.

_____

[1] Steele also stole a small number of DVDs from GameFly, J.A. 189, but for simplicity, we refer to the stolen discs collectively as video games.

In August 2016, a federal grand jury returned an indictment for Steele, charging him with one count of postal theft in violation of 18 U.S.C. § 1709. Steele pleaded guilty without a written plea agreement.

The U.S. Probation Office prepared a Presentence Investigation Report (PSR) based in part on a Victim Impact Statement from GameFly. In the statement, GameFly reported that it lost 1,390 video game discs during the relevant timeframe and that 100 were recovered from Steele's home and vehicle. GameFly estimated that the lost video game discs cost $40 each and thus calculated the value of the 1,290 unaccounted-for games at $51,600. GameFly further noted that for each of the 1,390 games that went missing, it incurred an additional $1 cost to mail its customers replacement games. The PSR therefore recommended that Steele pay $52,990 in restitution—$51,600 for the lost games themselves plus $1,390 in mailing costs.

Prior to sentencing, Steele objected to the PSR's loss calculation and restitution amount, but the district court overruled his objections. J.A. 183, 202. At sentencing, Steele argued that there was insufficient evidence to support the $40-per-game estimate. The Government responded that GameFly's estimate was based on the average cost of replacing a game. The Government then called as a witness Chad Caviness, an agent with the U.S. Postal Service Office of the Inspector General. Caviness testified that (1) agents recovered 341 discs from Steele's vehicle and residence, J.A. 46; (2) Steele sold newer games for $30 and older games for $20–25, J.A. 42; (3) he had no documentation from GameFly that detailed the value of each game it lost, J.A. 52; and (4) when GameFly reported an

3

estimated average replacement cost for the games, the agents "just took [GameFly's] word for it." J.A. 49.

After Caviness's testimony, Steele renewed his objection to the recommended restitution amount. Steel argued that GameFly's loss calculation should instead be based on the fair market value of the game discs because the vast majority of the games he stole were used and valued at substantially less than $40. Steele presented his own research—trade-in receipts and reports from a video game price charting website—to support his argument. However, the district court disagreed and instead reasoned that the fair market value of the games was "not relevant" to GameFly's actual victimization. J.A. 76. The district court then accepted GameFly's unsupported estimate of its replacement costs, ordered restitution in the amount of $52,990, and imposed a three-month term of imprisonment. J.A. 76, 89, 173. Steele timely appealed, challenging the restitution order.[2]

## II.

We review the district court's restitution order for abuse of discretion. *United States v. Ocasio*, 750 F.3d 399, 412 (4th Cir. 2014). "A district court abuses its discretion when it (1) acts arbitrarily, as if neither by rule nor discretion, (2) fails to adequately take into account judicially recognized factors constraining its exercise of discretion, or (3) rests its

---

[2] Steele also briefly argues that the district court erred in calculating his sentencing range under the Sentencing Guidelines; however his challenge is now moot. "We are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998). Because Steele was released from federal custody in January 2018, two months before oral argument, "there is nothing for us to remedy, even if we were disposed to do so." *Id.*

4

decision on erroneous factual or legal premises." *United States v. Alvarado*, 840 F.3d 184, 189 (4th Cir. 2016) (internal quotations marks and citation omitted).

## III.

"[F]ederal courts do not have the inherent authority to order restitution[.]" *United States v. Cohen*, 459 F.3d 490, 498 (4th Cir. 2006). "The power to order restitution must therefore stem from some statutory source[.]" *United States v. Broughton-Jones*, 71 F.3d 1143, 1149 (4th Cir. 1995) (quoting *United States v. DeSalvo*, 41 F.3d 505 (9th Cir. 1994)). Here, the authorizing statute is the Mandatory Victim's Restitution Act (MVRA), 18 U.S.C. § 3663A.

The MVRA provides that the district court "shall order . . . that the defendant make restitution to the victim of the offense" upon conviction for "an offense against property . . . including any offense committed by fraud or deceit." 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii). The district court must order a convicted defendant to either "return the property to the owner" or,

> if return of the property . . . is impossible, impracticable, or inadequate, pay an amount equal to—
>> (i) the greater of—
>>> (I) the *value of the property* on the date of the damage, loss, or destruction; or
>>> (II) the *value of the property* on the date of sentencing, less
>> (ii) the value (as of the date the property is returned) of any part of the property that is returned.

*Id.* § 3663A(b)(1) (emphasis added).

5

Steele argues that the district court miscalculated "the value of the property" by using GameFly's unsubstantiated estimate of its replacement costs rather than the fair market value of the stolen video games. *See id.* We agree. For the reasons set forth below we find that the district court erred by (A) rejecting the fair market value of the lost games and (B) improperly placing the burden of proof on Steele, the defendant.

A.

The MVRA gives district courts discretion to determine the proper method of calculating the value of lost property. The text of the MVRA clearly instructs courts *what* to value (the property that cannot be reasonably returned) and *when* to value it (the date of loss or the date of sentencing). 18 U.S.C. § 3663A(b)(1); *United States v. Boccagna*, 450 F.3d 107, 114 (2d Cir. 2006). However, Congress declined to instruct district courts *how* to value property. *Id.* Had Congress intended district courts to use a particular valuation method in all circumstances, presumably it would have articulated one. *Cf. Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) ("[I]t is generally presumed that Congress acts intentionally and purposely" when it "includes particular language in one section of a statute but omits it in another[.]" (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))). Instead of prescribing a single valuation method, the MVRA leaves that determination to district courts. The MVRA requires courts to issue restitution pursuant to 18 U.S.C. § 3664, which instructs the court to "order restitution to each victim in the full amount of each victim's losses *as determined by the court*[.]" 18 U.S.C. § 3664 (f)(1)(A) (emphasis added); 18 U.S.C. § 3663A(d). Accordingly, we agree with many of our sister circuits that district courts have discretion to determine how to value lost property under

6

the MVRA. *See, e.g.*, *Boccagna*, 450 F.3d at 115 ("[W]e construe 'value' as used in the MVRA to be a flexible concept to be calculated by a district court by the measure that best serves Congress's statutory purpose[.]"); *United States v. Frazier*, 651 F.3d 899, 904 (8th Cir. 2011) ("[T]he 'value' of lost property under the MVRA must be determined in the district court's discretion depending on the circumstances of each case."); *United States v. Kaplan*, 839 F.3d 795, 802 (9th Cir. 2016) ("It is within the district court's discretion to determine the proper method of calculating the value of such property when ordering restitution pursuant to 18 U.S.C. § 3663A."); *United States v. Ferdman*, 779 F.3d 1129, 1132 (10th Cir. 2015) ("Although the MVRA does not define 'value,' . . . [it] appears to contemplate the exercise of discretion by sentencing courts in determining the measure of value appropriate to restitution calculation in a given case." (internal quotation marks and citation omitted)).

District courts use a variety of methods to calculate the value of lost property. *See, e.g.*, *United States v. Howard*, 887 F.3d 1072, 1078 (10th Cir. 2018) ("[A] district court may, for different types of property, determine that fair market value, replacement cost, foreclosure price, cost to the victim, repair or restoration costs, or another measure of value is most appropriate."). Two common valuation methods are fair market value and replacement cost. Fair market value is "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's length transaction." *Fair Market Value*, Black's Law Dictionary (10th ed. 2014). Replacement cost, by contrast, is "[t]he cost of a substitute asset that is equivalent to an asset currently held." *Replacement Cost*, Black's Law Dictionary (10th ed. 2014). "In most cases, the replacement [cost] is greater

7

than the fair market value due to depreciation in value over time of many types of property." *Kaplan*, 839 F.3d at 800.

In determining which measure of value to employ, a district court's discretion is circumscribed by the MVRA's purpose and procedure. *Cf. United States v. Henoud*, 81 F.3d 484, 487 (4th Cir. 1996). "There is no question that the primary purpose of the MVRA was to ensure that victims are made whole[.]" *United States v. Grant*, 715 F.3d 552, 558 (4th Cir. 2013). Nevertheless, MVRA procedure "makes clear that the defendant is expected from the outset to repay all of the actual losses that he caused, but no more." *United States v. Ritchie*, 858 F.3d 201, 215 (4th Cir. 2017). Thus, in calculating restitution under the MVRA, courts abuse their discretion by granting the defendant a "bailout" or by allowing the victim to obtain a "windfall." *Id.* at 215–16 (4th Cir. 2017); *accord United States v. Stone*, 866 F.3d 219, 226 (4th Cir. 2017) ("[T]he MVRA does not allow a court to . . . unfairly punish a defendant by requiring him to pay back more money than he stole." (quotation marks and citation omitted)).

In most cases, fair market value generally provides the best measure of value to satisfy the MVRA. For example, in *Stone*, a mortgage fraud case, we declined to calculate restitution based on sale prices because the defendant had not sold the houses in arm's-length transactions, thus the sale prices did not represent "a fair market value for the houses." 866 F.3d at 227. *Stone* therefore signaled that absent special circumstances, fair market value is the default measure of value under the MVRA. *See also Boccagna*, 450 F.3d at 109 ("[F]air market value will generally provide the best measure to ensure restitution in the 'full amount' of the victim's loss."); *United States v. Genschow*, 645 F.3d

8

803, 814 (6th Cir. 2011) ("[F]air market value may often be the most appropriate measure of full restitution[.]"). *Frazier*, 651 F.3d at 904 ("In most circumstances, fair market value will be the measure most apt to serve [MVRA's] statutory purpose because this value reflects the property's greatest economic use, and generally provides the most reliable measure of the full loss sustained by a victim when his property is damaged, lost, or destroyed." (citations, quotation marks and alterations omitted) (citing *Boccagna*, 450 F.3d at 115)); *United States v. Shugart*, 176 F.3d 1373, 1375 (11th Cir. 1999) ("[F]air market value will often be an accurate measure of the value of property[.]").

This approach is particularly appropriate where, as here, the lost property is fungible. Fungible goods "are interchangeable with one another," and "by nature or trade usage, are the equivalent of any other like unit, such as coffee or grain." *Fungible Goods*, Black's Law Dictionary (10th ed. 2014); *see Ritchie,* 858 F.3d at 216 (noting that money is fungible); *Kaplan*, 839 F.3d at 802 (describing "precious metals, coffee, lumber, currency, wheat, or even marijuana" as examples of fungible goods); *Ferdman*, 779 F.3d at 1140 (characterizing cell phones as fungible); *compare Kaplan*, *Ritchie*, and *Ferdman with Shugart*, 176 F.3d at 1375 (holding that a church is not fungible property that can be traded in an active market). Because there is typically an active market for fungible goods, the market—by accounting for appreciation and depreciation—usually provides the most accurate measure of value at a particular time. *Cf. Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 870 (4th Cir. 1994) (holding that, in the bankruptcy context, sale price at an arm's length transaction is "conclusive evidence of the property's value.").

9

By contrast, replacement cost may be an appropriate measure of value when the fair market value is difficult to determine or would inadequately capture the value of the victim's actual losses. *See United States v. Simmonds*, 235 F.3d 826, 832 (3d Cir. 2000) (affirming the district court's use of replacement cost for furniture because "furniture often has a personal value to its owners that cannot be captured or accurately estimated by simply determining the market value of the furniture"); *Kaplan*, 839 F.3d at 802–03 (affirming the district court's use of replacement cost to value personal belongings like clothing, furniture, and home appliances because "fair market value would not have adequately captured the destroyed items' intangible, and perhaps sentimental, value to the victims"). Fair market value may be difficult to determine or an inadequate measure of loss where the "property is unique or lacks a broad and active market." *United States v. Genschow*, 645 F.3d 803, 814 (6th Cir. 2011); *accord Frazier*, 651 F.3d at 904 ("[I]f the actual cash value of the damaged, lost, or destroyed property is difficult to ascertain—because an item is unique, or because there is not a broad and active market for it, replacement cost rather than fair market value may better compensate a victim for the full amount of his loss." (internal quotation marks and citation omitted)); *Boccagna*, 450 F.3d at 109 ("[W]here property is unique or where no active market exists for its purchase, other measures of value may better serve the MVRA's compensatory purpose."). Courts, however, should be cautious when using replacement costs to calculate the value of lost property. Using replacement cost in inappropriate circumstances may incentivize victims to inflate their losses by replacing older, depreciated property with newer, more expensive property.

Our reasoning not only comports with that of other circuits, but also is consistent with the Sentencing Guidelines, which instruct courts to make a reasonable loss estimate for certain theft crimes, such as postal theft. According to the Guidelines, the loss estimate should be based on "[t]he fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property." U.S.S.G. 2B1.1, Application Note 3C(i). The loss estimate and the restitution amount are not always the same. But because the MVRA requires restitution for a victim's actual loss, the district court's loss estimate largely becomes the ultimate restitution amount. Accordingly, the Guidelines' commentary is relevant in MVRA cases. *Cf. United States v. Shell*, 789 F.3d 335, 356 (4th Cir. 2015) (holding that commentary in the Guidelines Manual "generally deserves 'controlling weight'" (quoting *Stinson v. United States*, 508 U.S. 36, 45 (1993)).[3]

Applying those principles to this case, we find that fair market value is the appropriate measure of value. The video games that GameFly lost are fungible—they are interchangeable with other games of the same title. Nothing in the record indicates that the stolen games had any unique or personal value to GameFly that fair market value could not adequately capture. *See United States v. Fonseca*, 790 F.3d 852, 854 (8th Cir. 2015) ("Absent proof that a firearm was unique, the actual loss resulting from a theft of a firearm

---

[3] The Sentencing Guidelines underscore the importance of fairly assessing a victim's loss because a district court's loss estimate can increase a defendant's imprisonment term. For example, because the district court estimated that the loss in this case exceeded $40,000, Steele's offense level increased by six points. U.S.S.G. 2B1.1(b)(1). The additional six points raised Steele's sentencing range from 0–6 months to 10–16 months.

11

dealer's inventory includes the fair market value of the stolen firearms."). And Steele's apparent success with selling and trading the games demonstrates that there was an active market for the used games. For those reasons, we find that the district court abused its discretion by ordering restitution based on GameFly's estimated replacement costs.

B.

In addition to using an inappropriate measure of value, the district court failed to hold the Government to its evidentiary burden.

Under the MVRA, "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the *Government*." 18 U.S.C. § 3664(e) (emphasis added). "And once the Government has satisfied its burden to offer evidence supporting its restitution calculation, the burden shifts to the defendant to dispute the amount with her own evidence." *Stone*, 866 F.3d at 227. "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e).

We have held that a victim's unsupported loss estimate was insufficient, on its own, to substantiate a restitution amount. In *United States v. Mullins*, we reviewed a restitution order issued pursuant to § 3664's procedures. 971 F.2d 1138, 1147 (4th Cir. 1992).[4] There,

---

[4] The restitution order in *Mullins* was issued under the Victim and Witness Protection Act (VWPA). *See* 971 F.2d at 1146–47. Unlike the MVRA, the VWPA is not mandatory, 18 U.S.C. § 3663(a)(1)(A), and instructs the court to consider the defendant's financial position when deciding whether to order restitution. 18 U.S.C. § 3663(a)(1)(B)(i)(II); *see also Ritchie*, 858 F.3d at 207. But, like the MVRA, the VWPA is "enforced in accordance with § 3664." 18 U.S.C. § 3663(d). As such, disputes as to the restitution calculation must be resolved the same way under both the VWPA and the

12

the defendant participated in a scheme to defraud a salesman of kitchen equipment. *Id*. at 1140. We observed that "[n]o findings were made as to the value of the equipment either on the date of loss or on the date of sentencing," nor was there any "evidence whatsoever in the record as to the value of the property returned [or] which date was used in determining the value of the property lost." *Id.* at 1147. Instead, the "only information in the record as to the value of the equipment [was a] paragraph in the presentence report stating that [the salesman] said the equipment was valued at $45,000, but that when he repossessed some of it, most had to be sold at auction." *Id.* This, we determined, was insufficient to satisfy the Government's burden of proof. *Id.* Accordingly, we remanded for further findings of fact to support the restitution order. *Id.*; *see also Ferdman*, 779 F.3d 1129, 1136–40 (holding that a victim's unverified letter was insufficient to justify restitution ordered under the MVRA).

Here, as in *Mullins*, the Government offered the victim's unsupported statement as its principal piece of evidence supporting the amount of restitution. The Victim Impact Statement form itself instructed GameFly not only to "state the financial loss sustained," but also to "*attach[] the proper substantiation records*." J.A. 208 (emphasis added). Yet GameFly did not attach a single record to substantiate its loss. In fact, Steele requested documentation from the Government that would substantiate GameFly's loss estimate, but the Government failed to produce any. J.A. 57. It is uncontested that GameFly, a large

MVRA, *i.e.*, by a preponderance of the evidence, with the Government carrying the burden of proof. 18 U.S.C. § 3664(e).

13

business with a Loss Prevention Department, had already catalogued its losses—the Government needed only to present those business records to meet its initial burden.[5] *See* 18 U.S.C. § 3664(e); *see also Henoud*, 81 F.3d at 490 (holding that "business records [from the victim-company] coupled with the testimony of a [company] employee" provided an "appropriate basis for establishing the amount of loss."); *United States v. Seignious*, 757 F.3d 155, 157 (4th Cir. 2014) (holding that restitution was adequately supported when the Government presented "the testimony of an investigative agent with the Secret Service who worked extensively on the case, and, through such agent, a summary exhibit of physical and documentary evidence regarding actual and intended losses caused by the bank fraud conspiracy").

The only other evidence of loss offered by the Government at sentencing was the testimony of Agent Caviness. But Caviness actually undercut the Government's restitution argument in two ways. First, Caviness admitted that he did not verify GameFly's loss estimate, he "just took [GameFly's] word for it." J.A. 49. Second, Caviness stated that agents recovered 341 games from Steele, contradicting GameFly's statement that 100 games were recovered.[6] In terms of GameFly's $40-per-game estimate, the 241-game

---

[5] Consistent with 18 U.S.C. § 3664(e), even if the Government met its initial burden of demonstrating the victim's loss, if disputed, the Government would still have to prove that the amount and type of restitution is appropriate by a preponderance of the evidence.

[6] Adding to the confusion, Steele's PSR provides yet another account of the games recovered from Steele: 39 games from Steele's vehicle and 133 games from Steele's home for a total of 172 games. J.A. 190. Put simply, it is entirely unclear from the record how many game discs were recovered from Steele and therefore how many video game discs Steele is responsible to pay for.

14

discrepancy between Caviness's statement and GameFly's statement amounts to almost a $10,000 difference in restitution.

At bottom, the Government merely rubberstamped GameFly's unsupported loss estimate. Rather than putting forth documentary evidence to support GameFly's estimate, the Government's only witness further called into question GameFly's estimate. We therefore conclude that the Government failed to meet its burden to demonstrate loss.

The district court compounded the error by placing the initial burden on Steele to demonstrate loss. But because the Government failed to meet its initial burden of demonstrating the amount of loss, the burden of proof never shifted to Steele. *See Stone*, 866 F.3d at 227. The court first claimed that Steele should have subpoenaed GameFly's records to obtain a more accurate measure of loss:

| | |
|---|---|
| THE COURT: | Did you—Did you subpoena the loss prevention person? |
| DEFENSE: | No, but I did request from the Government several times documentation from GameFly regarding the loss amount. I have the charts. I also have— |
| THE COURT: | Right, right. But it's not the Government's responsibility to prepare your arguments. |
| DEFENSE: | It's the Government's responsibility to prove loss. |
| THE COURT: | Yes, right. And they presented their argument. But you said I've asked them for documentation. I don't—for documentation, I guess, [the Government] doesn't have. [Government], do you have any of these documents [the Defense is] asking for? |
| GOVERNMENT: | No, Your Honor. |
| THE COURT: | All right. So they don't have them. So you asked for them. You don't have them. That doesn't mean it ends. You could have pursued it. |

15

J.A. 57. Later, in adopting the unsupported $40 estimate, the district court reasoned that requiring GameFly to produce records substantiating their losses would be unfair:

> [I]t would be nice to have a very lengthy report by the victim, but the bottom line is it's a little twisted for the victim to have to expend more money and time to prove their losses when—when the defendant is admitting his guilt. . . . [T]o get the restitution, they have to come back and spend a lot more time to prepare the restitution numbers. That's what's being asked here. I don't think that's required.

J.A. 76.

We cannot agree. Restitution under the MVRA "must be based on findings as to the value of the property as of the date of loss or the date of sentencing, and as to the value of any part of the property that is returned, as of the date of return. Even if it is difficult [or inconvenient] to measure those values, nonetheless, that is what the statute requires." *Mullins*, 971 F.2d at 1147 (describing the VWPA); *see also* MVRA, 18 U.S.C. § 3663A(b)(1)(B) (using nearly identical language to the VWPA). Nothing in the record indicates it would be difficult for GameFly to produce records substantiating its losses. Furthermore, the district court made no findings as to the value of the games on either the date of loss or on the date of sentencing. The district court also did not resolve how many games were ultimately recovered and therefore did not establish how many games Steele is accountable for. Therefore remand is also necessary for findings of fact to support the restitution order.

## IV.

All we have is GameFly's unsupported estimate of its replacement costs. There is no evidence that fair market value would have been inadequate or difficult to determine.

16

And the record contains no proof of the victim's actual loss. The district court abused its discretion by accepting GameFly's proffer of its losses because that amount represented the cost to purchase all new discs, rather than the discs' fair market value. And the Government failed to meet its burden of proving the disputed loss amount. We therefore vacate the order of restitution and remand for further factual findings consistent with this opinion.

*VACATED AND REMANDED*