# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3540

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | District of South Dakota. |
| | * | |
| Frank Michael Frazier, also known as | * | |
| Francis Michael Frazier, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 13, 2011
Filed: August 25, 2011

_____

Before WOLLMAN, BYE, and SHEPHERD, Circuit Judges.

_____

BYE, Circuit Judge.

Frank Frazier pleaded guilty to one count of arson in violation of 18 U.S.C. §§ 1153 and 81 for setting fire to his home on the Rosebud Indian Reservation. The district court sentenced Frazier to 37 months' imprisonment followed by five years' supervised release and ordered Frazier to pay restitution totaling $112,148.58 to the insurer of the home, victims who lost personal possession from the fire, and two organizations which had provided emergency financial assistance to the victims displaced from the home. Frazier appeals the restitution order contending the district court erred in awarding restitution to the two organizations that had provided emergency funds to the victims without reducing the amount of restitution owed to the

victims personally and further erred in using the replacement cost to determine the value of the homeowner's loss. We agree with Frazier on both challenges and therefore reverse the order of restitution and remand for further proceedings consistent with this opinion.

I

Frank Frazier resided in rural Norris, South Dakota, with his wife Erna Wooden Knife Frazier and four of Erna's grandchildren. Their home was a tribal-housing dwelling owned and managed by Sicangu Wicoti Awanyakapi (SWA) Corporation. The Fraziers moved into the house in 1998 under a "rent-to-own" contract in which a portion of the monthly rent payment made by Frank and Erna Frazier was placed in a Monthly Equity Payment Account (MEPA) for the future purchase of the home. The sale price under the contract was $54,354.27. As part of this rent-to-own contract, the title to the home remained with SWA until the full purchase price was paid, half by the Fraziers and half by the tribe through a contribution from the United States Department of Housing and Urban Development.

On March 6, 2010, Frank Frazier set fire to the house in a probable suicide attempt. Although emergency responders were able to save Frazier, who was hospitalized for five days, they were unable to save the home including all the belongings inside the home. At the time of the fire, the Fraziers had been paying on the rent-to-own contract for twelve years and the MEPA contained $9,963. During those same twelve years, the tribe contributed $25,601 toward the purchase price of the home. The payoff balance remaining on the contract on May 13, 2010 (about two months after the fire) was $28,727.14.

Several losses were claimed as a result of the fire. SWA filed a claim with their insurer, AMERIND Risk Management Corporation (AMERIND), for the loss of the home. AMERIND agreed to pay $86,317.59 to SWA based on an "Estimated

Replacement Cost" in accordance with the insurance agreement. This replacement cost was based on "such things as labor and materials to meet current building codes and general contractor profit and overhead for your location" as well as "all applicable permits, fees, overhead, profit, and sales tax." In addition to SWA's loss, Erna, the four grandchildren, and one of the grandchildren's boyfriend Jared L. Young (the Family), lost all their possessions from inside the home. The total loss to the Family was $18,493.99, which broke down into the following claimed amounts:

| | |
|---|---|
| J.L.Y. (minor grandchild) | $1,218.99 |
| Kelli R. Wooden Knife (grandchild) | $4,387.00 |
| S.B.W. (minor grandchild) | $10,328.00 |
| Erna Wooden Knife (wife) | $2,105.00 |
| Jared L. Young (Kelli's boyfriend) | $455.00 |

Erna also suffered a loss of $4,982.00 for her portion of the MEPA retained by SWA following the fire. Beyond those directly harmed by the fire, two organizations—the Red Cross and the Bureau of Indian Affairs (BIA)—claimed a combined loss of $2,355.00 for emergency financial assistance provided to the Family.

On April 13, 2010, Frazier was charged with one count of arson, in violation of 18 U.S.C. §§ 1153 and 81, to which he pleaded guilty. The Presentence Investigation Report (PSR) indicated AMERIND claimed $86,317.59 in restitution, to which Frazier objected. The PSR also indicated Erna had received emergency assistance payments from the Red Cross, the BIA, and other charities in the amount of $3,206.00, but did not indicate whether these organizations were seeking restitution or for what amounts restitution may be sought. Frazier did not object to this information in the PSR. However, just prior to sentencing, the government indicated it would seek restitution not only in the amount claimed by AMERIND, but also for the personal property loss claimed by the Family as well as for the emergency funds provided by the Red Cross and the BIA.

At the sentencing hearing, the district court reviewed and adopted the PSR, sentencing Frazier to 37 months' imprisonment and five years' supervised release. The district court then considered the government's claims for restitution. Frazier objected to the government's restitution claims on two grounds. First, Frazier challenged the government's request for full restitution in the amount of the personal property loss suffered by the Family even though the government also sought restitution in the amount of the emergency funds the Red Cross and the BIA provided to the Family. According to Frazier, the amount he owes the Family, who were the victims of the offense, should be reduced by the amount the Family received from the Red Cross and the BIA as compensation for their losses. Second, Frazier challenged the amount of restitution sought by AMERIND arguing the $86,317.59 amount was improperly based on the replacement value of the house instead of being more appropriately based on either SWA's loss under the rent-to-own contract—the payoff amount of $28,727.14—or the market value of the lost property less any equity amount in the MEPA retained by SWA which was owned by the Fraziers. The district court rejected each of Frazier's arguments and ordered restitution in the total amount of $112,148.58 to be paid in three stages. The first stage was payment to Erna, the grandchildren, and Young for $18,493.99 in personal property losses and $4,982.00 to Erna for the half of the MEPA lost to SWA; the second stage provided $2,355.00 to the Red Cross and the BIA; and the third stage was $86,317.59 to AMERIND for SWA's loss of the home.

Frazier appeals contending the district court erred in ordering restitution exceeding the total amount of the victims' personal property losses by requiring him to pay the victims in full while also requiring him pay the Red Cross and the BIA for the funds they provided the victims and it further erred by using the home's replacement value to determine SWA's actual loss amount.

-4-

## II

We review the district court's decision to award restitution for an abuse of discretion and the district court's finding as to the amount of loss for clear error. United States v. Chalupnik, 514 F.3d 748, 752 (8th Cir. 2008) (citing United States v. Petruk, 484 F.3d 1035, 1038 (8th Cir. 2007)). The government bears the burden of proving the amount of restitution based on a preponderance of the evidence. Id.; 18 U.S.C. § 3664(e). To the extent the district court interpreted the Mandatory Victims Restitution Act (MVRA) to determine its obligations in awarding restitution, we review those interpretations de novo. United States v. Statman, 604 F.3d 529, 535 (8th Cir. 2010).

To determine whether the district court abused its discretion in ordering Frazier to pay restitution to the Family, the Red Cross, the BIA, and AMERIND or whether it clearly erred in finding the amount of loss to be a total of $112,148.58, we must first define the parameters governing the district court's obligation to order restitution. The MVRA states a sentencing court "shall order . . . the defendant [to] make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). For the purposes of the MVRA, a "victim" is "a person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2). The district court should begin by identifying the victims of the defendant's conduct. See Chalupnik, 514 F.3d at 752 (beginning its analysis by determining whether BMG Columbia House qualified as a victim under the MVRA). Once the court has identified the victims, the next step is to determine "the full amount of each victim's losses." 18 U.S.C. § 3664(f)(1)(A); see Chalupnik, 514 F.3d at 754 (determining the amount of loss as proven by the government only after concluding BMG Columbia House was a victim). The amount of loss suffered by the victims of an offense, and in turn the amount of restitution a district court can order, "must be based on the amount of loss actually caused by the defendant's offense." Petruk, 484 F.3d at 1036 (internal quotation marks omitted).

If the offense resulted in the loss or destruction of property, the victim's actual loss equals "the greater of . . . the value of the property on the date of the damage, loss, or destruction; or . . . the value of the property on the date of sentencing." 18 U.S.C. § 3663A(b)(1)(B)(i). This section of the MVRA instructs a court as to the point in time when property should be valued, but it declines to prescribe any particular method to be used in determining the "value" of lost or damaged property. United States v. Boccagna, 450 F.3d 107, 114 (2d Cir. 2006) ("[T]he MVRA unambiguously tells a court *what* to value . . . and even *when* to value it . . . . The statute is silent, however, on the question of *how* the referenced property is to be valued."). Instead of prescribing a single method to be applied in all circumstances, the law contemplates discretion by the sentencing court in determining how to value a victim's losses. Statman, 604 F.3d at 537. Consequently, the "value" of lost property under the MVRA must be determined in the district court's discretion depending on the circumstances of each case.

Based on statutory interpretation principles, however, the district court should be careful when exercising its discretion to use the valuation method "that best serves Congress's statutory purpose." Boccagna, 450 F.3d at 115. We have previously defined Congress's intent for restitution under the MVRA to be "a compensatory remedy from the victim's perspective," and as such, restitution "should be limited to compensation for [the victim's] actual losses." Petruk, 484 F.3d at 1038 (emphasis added); see also Chalupnik, 514 F.3d at 754 ("[T]he amount of restitution that may be awarded is limited to the victim's provable actual loss.") (emphasis omitted); Boccagna, 450 F.3d at 117 ("[The court] cannot award the victim 'a windfall,' i.e., more in restitution than he actually lost."). The purpose of the MVRA is "to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." Statman, 604 F.3d at 538 (internal quotation marks and citations omitted). There are a variety of methods available to a court in determining the value of lost property including fair market value, replacement costs, and foreclosure prices. See United States v. James, 564 F.3d

1237, 1245 (10th Cir. 2009). Which of the available methods most closely comports with Congress's intent, however, depends upon the nature of the lost or damaged property. "In most circumstances, fair market value will be the measure most apt to serve this statutory purpose" because this value reflects the "property's greatest economic use, [and] generally provides the most reliable measure of . . . the full loss sustained by a victim when his property is damaged, lost, or destroyed." Boccagna, 450 F.3d at 115. By contrast, if "the 'actual cash value' of the damaged, lost, or destroyed property 'is difficult to ascertain-because an item is unique, or because there is not a broad and active market for it,' 'replacement cost' rather than fair market value may better compensate a victim for the full amount of his loss." Id. at 116 (quoting United States v. Shugart, 176 F.3d 1373, 1375 (11th Cir. 1999)). Consequently, the district court must select an appropriate valuation method based on the nature of the relevant property and then use that method to determine the victim's actual, full amount of provable loss, which in turn determines the amount of restitution to be ordered.

Once the district court has calculated the amount of each of the victim's losses, the court finally determines the manner of payment, taking into account factors such as the defendant's financial circumstances. 18 U.S.C. § 3664(f)(2). The court's instructions as to the manner of payment should include the order in which victims are paid and whether payments should be required in a lump sum or a series of installments. 18 U.S.C. § 3664(f)(3)(A)-(B). Relevant to the present case, this step also involves determining who should receive the restitution payment—the victim or a third party—because, as the MVRA instructs, if the victim "has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation." 18 U.S.C. § 3664(j)(1).

In summary, the court should first determine who all qualifies as a victim, then calculate each victim's actual, provable losses based on a preponderance of the

evidence, and finally determine whether the victim should receive the restitution or whether a third party has already provided the victim compensation and is therefore entitled to the restitution. With this background in mind, we turn to the specific issues on appeal.

## A. Restitution Ordered to the Red Cross and the BIA

We first address Frazier's argument as to the district court awarding restitution to the Family in the total amount of their claimed losses when it also awarded restitution to the Red Cross and the BIA for the amounts those organizations provided to the Family in emergency funds. The Family claimed $18,493.99 of personal property losses, to which Frazier did not object. Frazier also did not challenge the fact the Red Cross and the BIA provided a total of $2,355.00 ($1,355.00 and $1,000.00, respectively) to the Family following the fire. However, Frazier contends the district court erred in requiring him to pay restitution not only to the Family for the full amount of their personal property losses, but also to the Red Cross and the BIA for aid they provided to the Family because, as a result, the total restitution exceeded the full amount of the victims' losses.

The Family as well as the Red Cross and the BIA each claimed losses associated with Frazier's conduct; however, whether they qualify as victims depends on whether they were "directly and proximately harmed" by Frazier's arson. 18 U.S.C. § 3663A(a)(2). Putting SWA aside for the moment—we will discuss its loss separately below—the other victims of the arson are the Family because they were the only other ones directly and proximately harmed by the fire: their personal belongings were destroyed with the home. In contrast, the Red Cross and the BIA were not victims under the MVRA because neither demonstrated it suffered a direct or proximate harm from Frazier's burning down the home.

-8-

Concluding the Family qualified as victims of Frazier's conduct, we look to their losses to determine the amount of restitution available. As detailed above, the amount of restitution a district court is permitted to award under the MVRA cannot exceed the actual, provable loss realized by the victims. Chalupnik, 514 F.3d at 754. Based on the record, the Family suffered an undisputed total loss of $18,493.99 based on personal property destroyed by the fire. The Red Cross and the BIA's combined claim of a loss of $2,355.00 is not included because it is not a loss suffered by a victim of the offense. See 18 U.S.C. § 3664(f)(1)(A). Consequently, we conclude the total amount of loss suffered by the victims is the claimed amount of $18,493.99, which reflects the total amount of restitution the district court is permitted to award.

We next consider who is entitled to receive this restitution amount. Generally restitution is compensation for a loss and should be paid to the victims. Id. However, where a third party has already provided compensation to a victim, the third party is entitled to be paid for the amount it provided. See 18 U.S.C. § 3664(j)(1). In this case, the Red Cross and the BIA provided funds to the Family and thus they may qualify as third parties entitled to a portion of the restitution amount equal to their contribution so long as the funds they provided were compensation for the Family's losses caused by the fire.

The record before us, however, does not establish the purpose behind the Red Cross's or the BIA's providing funds to the Family and thus it is unclear whether the money provided by the Red Cross and the BIA was intended to act as compensation under 18 U.S.C. § 3664(j)(1). Consequently, a remand to the district court is appropriate to determine whether the Red Cross and the BIA are entitled to their claimed amounts of $1,355 and $1,000. We note that to the extent the Red Cross and the BIA are found to have provided compensation for the Family's losses and are therefore entitled to a portion of the restitution, this amount does not increase the total amount of the restitution order. Instead, given the restitution amount is based on the actual loss suffered by the victims, here $18,493.99, the compensation provided by a

third party merely shifts the payment of a portion of the restitution to that third party for reimbursement, and should result in a corresponding reduction in the amount of restitution ordered to be paid to the victims directly.

The government attempts to defend the district court's decision to award a total of $20,848.99 in restitution—$18,493.00 to the Family and $2,355.00 to the Red Cross and the BIA—but relies on a circular argument.[1] The government initially suggests the district court correctly awarded restitution to the Red Cross and the BIA because they are third parties who provided compensation to the victims of Frazier's offense under 18 U.S.C. § 3664(j)(1). See Appellee's Br. at 21-24. But the government also contends the Family's restitution should not be reduced by the amount of funds received from the Red Cross and the BIA because the funds were not compensation for the Family's claimed losses but rather were provided to cover "the victims for the costs associated with their emergency displacement." Id. at 24. We find this split position troubling because it characterizes the Red Cross's and the BIA's payments as compensation for the Family's losses in order to qualify the Red Cross and the BIA to receive restitution, but then immediately recharacterizes the payments as something other than compensation for the Family's losses in order to

[1]The government also contends Frazier cannot challenge the award of restitution to the Red Cross and the BIA because he failed to object to the portion of the PSR indicating Erna had received compensation from these organizations. We find this argument to be without merit. First, the PSR only indicates the Red Cross and the BIA, along with other organizations, provided Erna money; it does not indicate whether the organizations were seeking an award of restitution to reimburse them for those payments. Second, Frazier objected at the first opportunity he had to address the issue before the district court. Sentencing Transcript at 84. At the sentencing hearing, Frazier resisted the government's request for restitution for the Red Cross and the BIA expressing concern about the possibility of a double payment—and thus the restitution amount awarded exceeding the actual loss of the victims—if the amounts awarded to the BIA and Red Cross were not reduced from the restitution awarded to the Family. Id. We therefore hold Frazier did not waive his ability to challenge the restitution award with regards to the Red Cross and the BIA.

suggest the Family's restitution order should not be reduced by these received funds. We do not see how the funds provided by the Red Cross and the BIA could be both compensation entitling the organizations to restitution but then not be compensation for the losses relevant to the Family's claim for restitution. If nothing else, we find these competing positions taken by the government to reinforce our conclusion that the record is unclear as to the purpose of the Red Cross's and the BIA's payments and to further support the need to remand the case to the district court to resolve the fact-intensive questions as to whether the funds provided by the Red Cross and the BIA constituted compensation under 18 U.S.C. § 3664(j)(1).

## B. *Restitution for the Loss of the Home*

Moving to Frazier's other challenge, he contends the district court erred in awarding $86,317.59 in restitution to AMERIND. The parties do not dispute the district court's determination as to SWA being a victim of Frazier's arson, see 18 U.S.C. § 3663A(a)(2), or the district court's assignment of the payment of SWA's restitution to AMERIND given AMERIND had already fully compensated SWA for the loss of the home, see 18 U.S.C. § 3664(j)(1). Frazier's only challenge to this portion of the restitution order is the district court's finding as to the amount of SWA's loss, which ultimately determined the amount of restitution awarded to AMERIND. According to Frazier, the district court improperly relied upon the replacement value of the home in determining the amount of SWA's loss, and also failed to properly account for his and Erna's equity payments in the MEPA retained by SWA following the fire.

### 1. Value of Home

The district court awarded AMERIND $86,317.59 in restitution, which was AMERIND's calculated replacement value for the burned-down property under SWA's insurance contract. This valuation by AMERIND of the home's replacement

value was the main evidence offered by the government as to SWA's amount of loss. The only other evidence the government offered was the testimony of an asset manager for SWA, who opined the replacement value calculated by AMERIND was too generous toward Frazier because upon further research he determined the actual cost to rebuild was considerably more, likely exceeding $100,000, as a result of the increased overhead in getting materials to the reservation's remote location. Sentencing Transcript at 14. The district court concluded the insurance payment from AMERIND to SWA was "reflective of a payment for a loss—an actual loss that occurred, and the cause of the actual loss was Mr. Frazier . . . igniting the house on fire." Sentencing Transcript at 82. The district court explained, "[t]he home was largely destroyed—basically destroyed by the fire. And in situations like this, the Court . . . has awarded AMERIND the amount that it had to pay to SWA." Id. Based on these statements by the district court, it appears the court awarded restitution in the amount of $86,317.59, the estimated replacement value of the home, because AMERIND had to pay that amount to SWA under the insurance contract.

We do not find this to be a proper basis for determining SWA's loss. As a preliminary matter, restitution is based on compensating for a "victim's losses." 18 U.S.C. § 3664(f)(1)(A). AMERIND is not a victim. Thus it is not appropriate to determine the amount of restitution based on AMERIND's out-of-pocket cost. See 18 U.S.C. § 3664(f)(1)(B) ("In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution."). Instead, the focus is on the victim's—SWA's—actual loss. Although it could be argued the amount of compensation a victim receives from a third party is reflective of actual loss, the value of such information to the district court depends on how the compensation amount was calculated. Here, the payment SWA received from AMERIND was based on an estimated replacement value, which is an apt method of valuing a victim's loss under certain circumstances, such as when "the actual cash value of the damaged, lost, or destroyed property is difficult to ascertain-because an item is unique, or because there

is not a broad and active market for it." Boccagna, 450 F.3d at 116 (internal quotation marks and citation omitted). The Eighth Circuit has not yet defined the circumstances under which replacement value becomes an appropriate valuation method for determining a victim's amount of loss, but we glean insight from other circuits which have addressed this issue to conclude replacement value was not appropriate in the present case.

In United States v. Shugart, the Eleventh Circuit determined replacement value was the appropriate measure of the victims' actual losses resulting from the complete destruction of a church. 176 F.3d at 1375. The court affirmed the district court's decision to use replacement value because "[a] church is not a fungible commodity. A congregation rarely sells its church. . . . A church is unique, and is valued by its members, precisely because of its location, its design, and the memories it evokes." Id. The court determined the actual cash value of the church would not have been "an appropriate measure of value in this case" because the intangible characteristics of the lost church cannot be "recreated by purchasing an alternate structure in another city or neighborhood, even if such structure were available." Id.

Similarly, in United States v. Simmonds, the Third Circuit affirmed the use of replacement value in awarding restitution for the loss of furniture. 235 F.3d 826, 828-29 (3d Cir. 2000). The defendant, along with five others, damaged a person's residence causing, in part, a loss of furniture. Id. When determining the victim's actual loss, the district court used the replacement value instead of the market value for determining the amount of the victim's loss attributable to the destruction of the furniture. Id. at 830. In affirming this decision, the Third Circuit noted, "furniture often has a personal value to its owners that cannot be captured or accurately estimated by simply determining the market value of the furniture." Id. at 832.

These cases instruct that replacement value is intended to capture the amount of a victim's loss when the lost or damaged property lacks a viable market for

determining fair market value or is unique and carries with it intangible value that cannot easily be measured. Thus, we agree that in certain situations replacement value is the best measure of a victim's actual loss, particularly where the lost property is difficult to value. Conversely, in situations where the lost or damaged property is a fungible commodity with a viable market, we conclude replacement value is likely not appropriate because "fair market value will . . . provide[] the most reliable measure of . . . the full loss sustained by a victim." Boccagna, 450 F.3d at 115.

In choosing to rely on the replacement value in this case, the district court made no findings as to whether the destroyed home was a unique asset with intangible value or whether it lacked a viable market from which the court could have determined the fair market value. The record itself is sparse on this question, lacking any evidence from which we can determine whether the value of SWA's lost property would in fact be "'difficult to ascertain-because [it was] unique, or because there [was] not a broad and active market for it." Id. at 116 (internal quotation marks omitted). It was the government's burden to prove the amount of SWA's loss. Yet, in asking the court to rely on AMERIND's calculated replacement value for the destroyed home, the government provided no evidence to indicate the house was unique to SWA, nor did it demonstrate the home lacked a viable market. It is not clear on the record as to why the district court concluded this replacement value was, in the circumstances of this case, the best valuation method to achieve Congress's intent of making SWA whole. To be sure, SWA was the victim, not AMERIND, and the amount of restitution is to be based on SWA's actual, provable loss. Even though AMERIND agreed to pay SWA the replacement value of the home, it may not be the most accurate method for calculating SWA's actual losses. Accordingly, because we conclude replacement value is appropriate in only certain, limited circumstances and because the record fails to establish those circumstances are present in this case, we hold the district clearly erred in valuing SWA's actual loss based on the replacement value of the home.

Moreover, we are not persuaded by Frazier's proposed valuation method. Frazier suggests the better measure of SWA's actual loss is the amount of benefit SWA lost under the rent-to-own contract, treating it as if the contract had been completed. SWA's actual loss would have been only $28,727.14, the estimated payoff amount it would have received if Frazier completed the contract. According to Frazier, had the contract been completed, SWA would have the money and no property. Thus, if the district court ordered $28,727.14 in restitution and gave the now-worthless home to Frazier, SWA would be no worse off than if Frazier had completed the contract the day of the fire.

We have said the purpose of the MVRA is "to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." Statman, 604 F.3d at 538 (internal quotation marks and citations omitted). In so concluding, we also noted "[t]he intended beneficiaries . . . are the victims, not the victimizers." Id. (internal quotation marks and citation omitted). Accordingly, the benefit, if any, of the MVRA should fall to the victim, not the defendant. To do as Frazier requests would not return SWA to its "original state of well-being," but would instead put SWA in the hypothetical position it would have been in if Frazier had been able to provide a full payoff amount at the time of the fire. To base the value of SWA's loss on the contract payoff amount would not only result in SWA receiving less than its actual loss—which was the loss of the home—but would also be based on a speculative and hypothetical scenario, which is not a proper basis for valuing loss. Cf. Chalupnik, 514 F.3d at 754-55 (holding restitution is to be based on actual loss, not hypothetical loss, and "may not be 'based entirely upon speculation'") (quoting United States v. Young, 272 F.3d 1052, 1056 (8th Cir. 2001)); United States v. Patterson, 595 F.3d 1324, 1327 (11th Cir. 2010) ("[S]peculation has no place in [restitution] calculations."). Thus, on these facts, we reject Frazier's proposed contract-value determination of actual loss.

Instead of replacement value or contract value, we suggest the most appropriate measure of SWA's loss is likely the market value of the destroyed property as it tends to be "the measure most apt to serve" Congress's intent for the MVRA because it accounts for the "value of the property's greatest economic use." Boccagna, 450 F.3d at 115. SWA has not demonstrated any unique attachment to the destroyed property and further has not suggested it suffered any intangible loss in addition to the property loss. Accordingly, before the arson, SWA owned the home on the Rosebud Reservation. Once the property was destroyed, SWA was without the property. Based on SWA's "original state" before the arson, and its current state following the arson, the loss it suffered was the loss of the value of its ownership in the home. And as a house to which SWA had no unique attachment, the property can likely be valued based on an active market for similar assets. Thus, to make SWA whole again, it should receive the market value of the property. We observe, however, the record is devoid of evidence establishing the market value at the time of the arson or on the date of sentencing. The SWA asset manager suggested the property was worth more than the $54,354.27 listed in the Fraziers' rent-to-own contract, but there is no other evidence in the record to guide us or the district court in valuing the destroyed home. Consequently, we conclude a remand is necessary on this issue for the government to either prove the market value by a preponderance of the evidence or provide sufficient facts to support the use of an alternative valuation method.

## 2. Treatment of MEPA

Aside from the issue of how to value SWA's loss, there is also the matter of the $9,963 in the MEPA owned by the Fraziers and retained by SWA following the fire. As the district court found, the ownership in the lost property consisted of two pieces: "the ownership stake . . . of the Fraziers [of] $9,963 at the time of the fire" in the MEPA and the "remaining ownership [of the property]. . . with SWA Corp." Sentencing Transcript at 82. In ordering restitution, the district court required Frazier to pay Erna $4,982.00 for her half of the MEPA retained by SWA following the fire.

-16-

Frazier contends the restitution order is duplicative in that it requires him to pay on the full amount of SWA's loss without regard to the fact SWA retained the $9,963.00 MEPA while it also requires him to pay Erna for her half of the account. We, too, have some concern over the treatment of the MEPA in the restitution order.

SWA claims it is entitled to keep the MEPA either as a result of Frazier's breach of the contract or because the Fraziers had $9,533.58 in delinquent payments under the contract. The record, again, is so sparse we cannot determine the purpose for which SWA retained the MEPA.[2] However, to the extent SWA was entitled to retain the money in the account under the contract as a form of compensation for damage to the property in the event of a breach, the amount retained should offset the amount SWA may claim because it reduces the amount of actual loss SWA suffered. This interpretation accords with the intent of Congress in enacting the MVRA—to compensate a victim in order to restore the victim to his original state, but not to overcompensate so as to provide a windfall. See Petruk, 484 F.3d at 1038. Therefore, on remand the district court will need to address the proper treatment of SWA's retaining the MEPA.

In so concluding, we note the government raises several arguments as to why SWA is entitled to certain sums of money under the rent-to-own contract. But the criminal restitution process is not intended to compensate a victim for damages it may otherwise be entitled to in a civil proceeding. Chalupnik, 514 F.3d at 754. By retaining the $9,963 in equity the Fraziers owned in the MEPA, it is likely SWA was

---

[2]The terms of the contract between the Fraziers' and SWA permits SWA, in the event of a breach of contract, to charge against the MEPA: "(1) Any maintenance and replacement costs incurred by [SWA] to prepare the home for the next occupant; (2) Any amount the homebuyer owes [SWA], including required monthly payments; (3) The required monthly payment for the period the home is vacant . . .; and (4) The cost of securing a vacant unit, the cost of notification an associated termination tasks, and the cost of storage and/or disposition of personal property." Gov. Exh. No. 7 at 16.

in part compensated for the loss of the property. Accordingly, the property loss incurred by SWA should be reduced by that compensation. If SWA is entitled to additional damages based on Frazier's breach of contract—e.g., delinquent rent payments—SWA may seek those funds in a civil suit.

## III

We conclude the district court erred in awarding full restitution to the family for their personal property losses while also awarding restitution to the Red Cross and the BIA for the amount of funds each provided to the family. We further conclude the district court erred in calculating SWA's actual loss to be the replacement cost of the destroyed home and in failing to account for SWA's retention of the Fraziers' MEPA. Accordingly, we reverse the district court's restitution award in its entirety and remand for further proceedings consistent with this opinion.

_____