# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2900

_____

United States of America

*Plaintiff - Appellee*

v.

Paul Kramer

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: May 16, 2014
Filed: October 2, 2014

_____

Before RILEY, Chief Judge, BEAM and SHEPHERD, Circuit Judges.

_____

BEAM, Circuit Judge.

Paul Kramer appeals his conviction on several counts of conspiracy to commit bank fraud, bank fraud, and wire fraud, all relating to Kramer's activity in his mortgage lending and related businesses. We affirm the district court.[1]

_____

[1]The Honorable James E. Gritzner, Chief Judge, United States District Court for the Southern District of Iowa.

## I.    BACKGROUND

Three businesses formed, owned, and operated by Kramer are especially relevant to this bank fraud case: Kramer Mortgage Company, Iowa Closing and Escrow, and LDF Development.    In 1999, Kramer started Kramer Mortgage Company, a company principally involved in offering intermediary services to borrowers seeking home loans from banks.  These services included finding lenders, filing applications, and providing supporting documentation to the lenders. Eventually, Kramer Mortgage began providing construction loans to borrowers and by 2006 was providing its customers construction financing.  In 2004, Kramer and several other individuals also formed a real estate closing company known as Iowa Closing and Escrow.  By 2008, Kramer began managing the day-to-day operations of Iowa Closing and Escrow, and Kramer Mortgage used Iowa Closing and Escrow to close many loans financed by Kramer Mortgage.  In 2006, Kramer, Lane Anderson, Shannon Flickinger, and Dave Mable formed LDF Development.  LDF engaged in the business of flipping houses–i.e., buying homes, renovating them, and selling the homes for a profit.  LDF obtained financing from Kramer Mortgage.  LDF also used Iowa Closing and Escrow to close its home sales.

To provide this financing, in July 2006, Kramer Mortgage entered into a credit agreement with U.S. Bank whereby U.S. Bank agreed to provide Kramer Mortgage a revolving line of credit up to $4 million.  When Kramer Mortgage loaned money to a homebuyer, it drew upon its line of credit from U.S. Bank to make the loan.  The homebuyer then gave Kramer Mortgage a mortgage interest in the home, and Kramer Mortgage assigned that interest to U.S. Bank as collateral on the line of credit.  Under the credit agreement, when a homeowner paid off his or her construction loan from Kramer Mortgage, Kramer Mortgage was to forward the payment to U.S. Bank to pay off the line of credit.  Once paid in full, Kramer Mortgage and U.S. Bank would release their mortgage interests, giving the homeowner unencumbered title.  If Kramer Mortgage was paid and released its mortgage without forwarding payment

to U.S. Bank, U.S. Bank was left unsecured on the line of credit to Kramer Mortgage. The credit agreement was customized to U.S. Bank's relationship with Kramer Mortgage, however in some ways it resembled a warehouse line of credit.[2]

During the infancy of the credit agreement, Kramer Mortgage negotiated terms of the agreement with U.S. Bank representative Robert Bakker. Each advance on the line of credit was tied to a specific property that Kramer Mortgage was financing. Kramer Mortgage soon exhausted its line of credit, and U.S. Bank increased the limit to $4.25 million. On April 4, 2007, Kramer informed Bakker that two homeowners had not yet paid off two specific loans, but would soon. In reality, the homeowners had already paid their loans but Kramer waited nearly two months to forward payment. Kramer Mortgage collected payments on several properties pledged as collateral that it either delayed forwarding or did not forward at all. Kramer Mortgage also double-pledged collateral to obtain additional financing on properties from other banks. None of the other banks involved knew of U.S. Bank's interest and vice versa.

By 2008, U.S. Bank had growing concern because several properties that Kramer Mortgage had pledged to U.S. Bank were not paid off but were approaching the payoff deadline. Given the growing risk associated with Kramer Mortgage, U.S. Bank's Special Assets Group took over the account. U.S. Bank requested Kramer Mortgage to provide a list of all properties it had financed, and, subsequently, conducted a title review of these properties. The review revealed that Kramer Mortgage had double-pledged properties, released some properties without forwarding payment, and lost some properties in delinquent tax sales. When

---

[2]U.S. Bank representative Robert Bakker testified at trial that a warehouse line of credit meant a revolving line of credit that you can borrow on and pay off over time, with interest only payments, and principal due at maturity.

confronted, Kramer admitted he had not forwarded payoffs on multiple properties. U.S. Bank put a hold on Kramer Mortgage's account and issued a default notice.

Even after U.S. Bank sent notice, Kramer Mortgage continued to keep payoff payments on multiple properties, and neglected to inform U.S. Bank about their receipt. Kramer used the money for personal expenses and to replenish trust accounts at Iowa Closing and Escrow that he had previously raided for personal expenses. The money he had previously taken from the trust accounts constituted sale proceeds deposited at closings and should have been used to pay off sellers' remaining mortgages when they sold their homes. As a result, sellers received late payment and default notices on mortgages that should have been satisfied.

LDF also began having financial difficulties during this time period. By late 2006, LDF was having difficulty selling homes. As a result, LDF was unable to maintain its loan obligations to Kramer Mortgage. To obtain additional financing, LDF sold properties to Flickinger–an LDF owner–who obtained loans to buy the properties. Although Flickinger applied for loans as if he were an actual homebuyer, he had no intention of living in any of the homes. The only purpose behind the sales were so LDF could obtain additional capital to service its loans from Kramer Mortgage. Flickinger's loan applications contained numerous misstatements. Anderson prepared the applications. Kramer closed the loans at Iowa Closing and Escrow knowing that the applications and loan documents contained misrepresentations and directed an employee to notarize false documents.

Eventually, U.S. Bank sued Kramer Mortgage to collect on the outstanding credit line and obtained a judgment against it for $3,782,091.52. Prior to the judgment, U.S. Bank sold some of the collateral, reflected in the judgment, and again sold some of the collateral after the judgment. After the post-judgment sales, Kramer Mortgage's account resulted in more than $2 million in loss to U.S. Bank.

On September 28, 2010, the FBI interviewed Kramer. Kramer confirmed the specifics of the credit agreement and admitted he did not remit payoffs to U.S. Bank and revealed how he was operating his mortgage business, but claimed he did not intend to defraud anyone. Kramer and his LDF associates Anderson, Flickinger, and Mable were charged with one count of conspiracy to commit wire fraud, and Kramer, Anderson and Mable were charged with one count of conspiracy to commit bank fraud. Kramer alone was charged with twelve counts of bank fraud (though three of these counts were dismissed during trial) and seven counts of wire fraud. Anderson and Kramer proceeded to trial, while the other two defendants accepted a plea agreement. Before trial, Kramer unsuccessfully moved to sever his trial from Anderson's. At trial, the district court refused to allow Kramer to introduce evidence regarding the civil lawsuit U.S. Bank commenced against Kramer. The jury convicted both Kramer and Anderson on all charged counts. After trial, Kramer unsuccessfully moved for acquittal and a new trial based on, among other things, allegedly inflammatory remarks the government made during closing arguments. Kramer appeals, alleging as error the district court's decisions regarding the severance, the exclusion of certain evidence, and the closing argument. Kramer also challenges the district court's loss calculation and restitution amount of $2,601,885.91.

## II.    DISCUSSION

### A.    Severance

Kramer argues that the district court abused its discretion by failing to sever his trial from co-defendant Anderson's trial. We will reverse a denial of a motion to sever only if the appellant demonstrates an abuse of discretion resulting in clear prejudice. United States v. Casteel, 663 F.3d 1013, 1018 (8th Cir. 2011). Kramer complains that he was prejudiced because he was "double-teamed" by Anderson's counsel and the government putting blame on Kramer. Kramer presents a list of examples where

Anderson's counsel attempted to emphasize Kramer's guilt and also agreed with the government's position on several of Kramer's objections. Kramer also claims he and Anderson had adverse legal positions, and their counsel were antagonistic toward each other.

Federal Rule of Criminal Procedure 14(a) vests the district court with authority to order severance if consolidation for trial appears to prejudice the government or a defendant. Nevertheless, there is a strong presumption against severing trials. United States v. Delpit, 94 F.3d 1134, 1143 (8th Cir. 1996). In Delpit, we addressed the type of situation Kramer believes is prejudicial and rejected the notion, stating:

> [C]o-defendants are often hostile to one another, and one will try frequently to "point the finger," to shift the blame, or to save himself at the expense of the other. "Antagonistic" defenses require severance only when there is a danger that the jury will unjustifiably infer that *this conflict alone demonstrates that both are guilty*.

Id. (internal quotation omitted) (second alteration in original).

Here, over the course of a thirteen-day trial, the instances in which Anderson attempted to pass blame onto Kramer were relatively few. Moreover, nothing is prejudicial about Anderson's testimony that tended to implicate Kramer. Zafiro v. United States, 506 U.S. 534, 540 (1993) ("[W]e see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant."). And, as the government points out, much of the antagonism that existed between defense counsel arose outside of the presence of the jury or had nothing to do with the merits of the case. Similarly, that Anderson's counsel disagreed with some of Kramer's counsel's tactics and objections does not establish prejudice against Kramer. The district court did not abuse its wide discretion in refusing to sever and even if it did, Kramer has not satisfied the substantial hurdle to show clear prejudice.

-6-

## B.    Good-Faith Evidence

Kramer alleges the district court erred in denying his motion for a new trial based on the court's exclusion of evidence from the civil suit to support Kramer's good-faith defense in the criminal case. At trial, the district court admitted the basic fact that U.S. Bank had sued Kramer over the debt but refused to allow, under Federal Rule of Evidence 403, evidence of the underlying facts of the civil suit. Kramer sought to introduce evidence that the bank sued him on a revolving note account as opposed to a warehouse line of credit, which he asserts would have shown that he was not necessarily *required* to turn over payment to the bank each time he received a payoff of a particular property. Kramer further wanted to adduce evidence that the lawsuit did not include allegations of fraud, and that he and the bank continued to negotiate until the filing of the lawsuit and during the ensuing litigation.

We review the district court's decision to exclude evidence for a clear and prejudicial abuse of discretion[3] and similarly review the denial of new trial for an abuse of discretion. Bair v. Callahan, 664 F.3d 1225, 1228, 1230 (8th Cir. 2012). However, we will not reverse an evidentiary error if the error was harmless. United States v. Shores, 700 F.3d 366, 373 (8th Cir. 2012), cert. denied, 133 S. Ct. 2780 (2013).

First, Kramer's continued negotiations with U.S. Bank had limited probative value as to his fraud in the criminal case. United States v. Radtke, 415 F.3d 826, 840-41 (8th Cir. 2005) ("[S]elf-serving exculpatory acts performed substantially after a defendant's wrongdoing is discovered are of minimal probative value as to his state of mind at the time of the alleged crime."). And, the district court determined this

---

[3]We decline Kramer's invitation to review this issue de novo because the district court allegedly denied his constitutional right to present a complete defense. Our review of the record indicates that Kramer was allowed to and did conduct a vigorous defense.

evidence might have injected substantial confusion into the criminal case. See United States v. Johnson, 463 F.3d 803, 809 (8th Cir. 2006) (recognizing that "we give great deference to the district court's ruling" under Rule 403).

At first blush, the probative value of the proffered evidence seems appreciable. However, the government correctly points out that U.S. Bank was not required to allege fraud in the civil suit to collect an unpaid debt. Further, nothing precluded Kramer from adducing testimony during his criminal case that revealed the nature of Kramer's agreement–or Kramer's understanding of the agreement–with U.S. Bank. In fact, Kramer cross-examined the bank witnesses at length about the nature of the credit agreement, and the bank witnesses admitted on cross-examination that the agreement was not a strictly defined warehouse line of credit. Kramer testified about his understanding of the agreement, and the jury viewed the contract documents. Through cross-examination and his own testimony, Kramer was able to present evidence of his negotiations with the bank and his efforts to repay and provide adequate collateral for the loans. Accordingly, a large portion of evidence that Kramer sought to admit–the ambiguous nature of the credit agreement, Kramer's negotiations and efforts to repay the bank–was presented to the jury. Thus, we find the district court was within its discretion to exclude the possibly confusing and certainly cumulative evidence, see Federal Rule of Evidence 403 (permitting the exclusion of relevant evidence when confusion of the issues might result or if the evidence is cumulative), and that any possible error in refusing to admit the evidence was harmless.

C.    Closing Arguments

Next, Kramer asserts that the district court erred in refusing to grant a mistrial on the basis that the prosecutor made improper remarks during closing arguments. Specifically, during closing arguments, the government described Kramer's business scheme as "Robbing Peter to pay Paul" and placed the statement on a PowerPoint

slide. Kramer argues that the statement insinuates violence (robbery) and has added force in the present context because Kramer's first name is Paul. "The district court enjoys broad discretion in controlling closing arguments. We will overturn a conviction only for a clear abuse of that discretion." United States v. Beaman, 361 F.3d 1061, 1064 (8th Cir. 2004).

As the district court recognized, the phrase "Robbing Peter to pay Paul" is a figure of speech that has no specific ties to violence in this case. Moreover, after Kramer's counsel objected to the PowerPoint, the government explained the nature of the phrase, that this case involved no violence, and that it was merely happenstance that Kramer's first name was also Paul. When viewed in context, the district court did not abuse its discretion in allowing the government to use the common phrase, and Kramer cannot establish that he was prejudiced by use of the words. See United States v. Jumping Eagle, 515 F.3d 794, 806 (8th Cir. 2008) ("To obtain a reversal, the defendant must show that (1) the prosecutor's remarks were improper, and (2) the remarks prejudiced the defendant's rights in obtaining a fair trial.").

## D. Restitution

Kramer also disagrees with the district court's loss calculation for the restitution order. At the restitution hearing, the government provided the district court a chart of 30 properties which U.S. Bank sold. To arrive at a total loss amount, the district court merely took the amount of debt less the proceeds of the property sales and insurance recovery. The district court ordered restitution of $2,601,885.91. Kramer claims the district court erred in relying on the government's chart because 24 of the 30 properties are not identified in the indictment, and there is no evidence linking the properties to Kramer's fraud. "We review the district court's decision to award restitution for an abuse of discretion and the district court's finding as to the amount of loss for clear error." United States v. Frazier, 651 F.3d 899, 903 (8th Cir. 2011).

In the context of real estate fraud, we have held that restitution may be calculated by "subtracting the price paid at a sheriff's sale or short sale of the property . . . from . . . the amount the victim was entitled to collect." United States v. Engelmann, 720 F.3d 1005, 1015 (8th Cir. 2013). And, although we require a connection between the fraud and restitution, our cases do not require the type of connection Kramer demands. For example, in United States v. Spencer, a defendant involved in a mortgage fraud scheme, like here, argued that the government did not prove that specific properties used to calculate loss were tied to fraud because they were not alleged in the indictment. 700 F.3d 317, 324 (8th Cir. 2012). We highlighted that "[w]here an offense has as an element a scheme, conspiracy, or pattern of criminal activity, restitution may include losses that are directly caused by the defendant's conduct as part of the scheme, conspiracy, or pattern." Id. Thus, we rejected the defendant's argument, noting that the government presented evidence that loans on the properties "were secured as part of the scheme that was charged in the indictment." Id.

Here, the evidence at trial established Kramer's overall fraudulent scheme charged in the indictment. At the restitution hearing, the government presented evidence of 30 properties that were part of Kramer Mortgage's portfolio and forced into foreclosure sales–(the government did not even list properties that constituted a total loss because Kramer double-pledged the property or it had become a nuisance property). Like Spencer, although there is not evidence tying each property to a specific act of fraud, by its very nature, Kramer's overall fraudulent scheme encapsulated each property. Cf. United States v. DeRosier, 501 F.3d 888, 897 (8th Cir. 2007) ("We have consistently held that restitution may be ordered for criminal conduct that is part of a broad scheme to defraud, even if the defendant is not convicted for each fraudulent act in the scheme."). Therefore, the district court did not err in its restitution calculation.

**E.    Cumulative Error**

Finally, Kramer argues that although each individual error may not warrant reversal, when viewed together, all combined errors require reversal. "Because we have not found multiple errors, harmless or otherwise, we must also reject this contention." United States v. Wilkens, 742 F.3d 354, 364 (8th Cir.), cert. denied, 134 S. Ct. 2744 (2014).

**III.    CONCLUSION**

We affirm the district court in all respects.

_____

-11-